**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| MILL BRIDGE V, INC. | : | |
| as successor to | : | |
| VAN DER MOOLEN OPTIONS USA, | : | |
| LLC c/o VAN DER MOOLEN | : | |
| SPECIALISTS, LLC, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | NO.  08-2806 |
| I. ISABELLE BENTON, | : | |
| BENTON PARTNERS II, LLP, | : | |
| JAMES KENKELEN, a transferee, and | : | |
| EILEEN WHITE, a transferee, | : | |
| | : | |
| Defendants. | : | |


**MEMORANDUM**

BUCKWALTER, S.J.                                                    December 3, 2009

Currently pending before the Court is the Motion of Defendants Benton Partners II, LLP and

I. Isabelle Benton to Dismiss the Second Amended Complaint.  For the following reasons, the

Motion is granted in part and denied in part.

**I.      FACTUAL AND PROCEDURAL HISTORY**

    **A.      Factual Background**

        **1.      History and Facts About the Philadelphia Stock Exchange**

According to the facts set forth in the Second Amended Complaint, the Philadelphia Stock

Exchange, Inc. ("PHLX") was founded in 1790 and, since then, has continuously conducted

business in the city of Philadelphia.  (Sec. Am. Compl. ¶ 15.)  The PHLX is registered under section

78f of the Exchange Act as a self-regulatory organization ("SRO") and, as such, is overseen by the

Securities and Exchange Commission ("SEC").  (Id. ¶¶ 17-18.)  In addition to the federally promulgated rules and regulations, the PHLX also operates under its own set of rules and has an elected and appointed governing body.  (Id. ¶ 21.)   The PHLX officials include a chair, two vice-chairs, and members of the governing board, who are responsible for the general operation of the PHLX.  (Id. ¶¶ 23, 25.)  In addition, the Board designates members and non-members to serve on Standing Committees, such as Executive, Finance, Business Conduct, Floor Procedure, and Options. (Id. ¶ 24.)

Through January 20, 2004, the PHLX was operated as a not-for-profit mutual association incorporated in Delaware.  (Id. ¶ 16.)  There were 505 seats on the PHLX, with one of the seats owned by the PHLX itself.  (Id.)  Those who owned a "seat" on the PHLX effectively owned an equity interest in the association and maintained the right to trade on the PHLX floor.  (Id.)  On January 21, 2004, the PHLX was "demutualized," such that it became a for-profit Delaware corporation owned by its stock holders.  (Id.)  Each of the other 504 seats was exchanged for, or converted into, one hundred shares of Class A PHLX stock.  (Id.)  Those owning Class A stock were entitled to a "special dividend" under certain contingencies.  (Id.)  Demutualization had no effect on the PHLX's status as an SRO, and the SEC approved the required rule changes for PHLX to operate as a for-profit stock corporation.  (Id. ¶ 17.)  From January 21, 2004 through December 31, 2006, all transactions in PHLX stock were required to be done in units of 100 shares.  (Id. ¶ 26.)

Prior to demutualization, the best bids for and offers of PHLX were public, with the person or entity making the bid or offer identified.  (Id. ¶ 27.)  Any change in seat ownership was publicly posted and listed in the next PHLX bulletin.  (Id.)  After demutualization, however, and until

approximately December 1, 2004,[1] the only way to obtain an indication of interest to buy or sell PHLX stock was to contact the Shareholder Services Department. (Id. ¶ 28.) Unless the inquiring person was listed as a qualified investor with Shareholder Services, no information regarding bids was given. (Id.) If a stock transaction was to be consummated, the Shareholder Services Department acted as an intermediary and revealed the parties' identities at that juncture. (Id.)

## 2. Relevant Events in PHLX's History

In 1997, Meyer (Sandy) Frucher joined the PHLX board. (Id. ¶ 29(a).) By June of 1998, Frucher became the Board Chair and PHLX CEO, remaining in that position during all times relevant to the allegations of the Second Amended Complaint. (Id. ¶ 29(b).) Throughout his tenure, the PHLX continuously searched for new ways to obtain an influx of capital. (Id. ¶ 29(c),(d).) At some point in 2001, Frucher assembled a team consisting of Norman Steisel, Robert Gerard, and the PHLX outside financial advisor, Keefe, Bruyette & Wood, Inc. ("KBW") to demutualize the PHLX and seek out strategic partnerships or investors to provide the needed capital. (Id. ¶ 38.)

Beginning in July 2001, KBW pursued sales of PHLX assets and performed a series of valuations of and for the PHLX, at which time it valued PHLX assets for purposes of sale. (Id. ¶¶ 32-33.) During an October 2002 Board meeting, KBW informed the PHLX Board of Governors that the PHLX had a value of between $250 and $350 million. (Id. ¶ 34.) KBW also explained that the PHLX's structure as a not-for-profit mutual association restricted its ability to enter into deals with "strategic investors" and that demutualization was a necessary course. (Id. ¶ 35.) This information was purportedly obtained from a transaction known as the "Kwok Li deal," in which

---

[1] After December 1, 2004, indications of interest began to be published on a public website. (Id. ¶ 28.)

another business sought to enter into a profit-making arrangement with the PHLX. (<u>Id.</u>) Notably, seat owners on the PHLX were repeatedly told of PHLX's financial problems, but were never told of the value the PHLX could have with the entry of strategic investor. (<u>Id.</u> ¶ 37.)

Frucher thereafter developed a plan for demutualization that was presented to the Board in December 2002. (<u>Id.</u> ¶ 29(e).) On February 12, 2003, Frucher published an official memo to the PHLX community on various issues that had arisen in connection with the demutualization, including the future equity interest of management and the voting rights of members and seat owners. (<u>Id.</u> ¶ 29(f).) Subsequently, on October 22, 2003, the PHLX Board issued an "Informational Memorandum on Demutualization" ( the "Info Memo"). (<u>Id.</u> ¶ 29(g).) This document contained, in part, an advisory letter from KBW, and represented that the survival of the PHLX was in jeopardy unless the PHLX received an infusion of capital. (<u>Id.</u>) Further, it indicated that the value to a seat owner of an ownership interest in the PHLX would be less than zero if a seat owner opted out of demutualization in lieu of a state law appraisal of his or her rights. (<u>Id.</u>)

In the fall of 2004, PHLX conducted talks with Citadel, who expressed interest as a potential strategic partner in the PHLX. (<u>Id.</u> ¶ 29(h).) Throughout the remainder of the fall season, the PHLX publicized statements that it had been advised to seek bankruptcy counsel. (<u>Id.</u> ¶ 29(I).) By November of 2004, PHLX began serious negotiations with Archipelago Holdings ("Arca"). (<u>Id.</u> ¶ 29(j).) Arca and PHLX entered into a confidentiality agreement, on December 3, 2004, to allow the parties to exchange information for purposes of negotiations. (<u>Id.</u>) Arca ultimately offered to purchase the PHLX for $50 million, to be paid through a combination of cash and Arca stock. (<u>Id.</u>) On April 21, 2005, however, the PHLX announced that it rejected the possible sale to Arca to pursue other options. (<u>Id.</u> ¶ 29(k).)

Subsequently, on August 16, 2005, Interactive Brokers Group (Timber Hill) sent a letter to Frucher offering to pay $20,000,000 for a non-dilutable twenty percent equity interest in the PHLX. (Id. ¶ 29(l).) Ultimately, on September 22, 2005, the PHLX issued a tender offer to buy up to 167 blocks of 100 shares at $900 per share from the original Class A shareholders, effectively offering to retire stock from these shareholders at the same price they would have received had the Arca deal been consummated. (Id. ¶ 29(m).) During these relevant transactions, the PHLX Board used KBW as its financial advisor and Wilkie, Farr & Gallagher ("WFG") as its legal counsel. (Id. ¶ 30.)

### 3. Background of Plaintiff Mill Bridge V, Inc.

Van der Moolen Options U.S.A., LLC ("VDM") was a Delaware limited liability company that, in part, conducted business as a specialist on the options floor of the PHLX. (Id. ¶ 9.) At the close of 2003, VDM terminated its options business on the PHLX floor and ended its membership in the PHLX. (Id. ¶ 10.) Before doing so, VDM entered into negotiations to sell its PHLX operations to Defendant I. Isabelle Benton, during which time VDM provided Benton with non-public information. (Id. ¶ 11.) The negotiations ended without a deal being consummated. (Id.)

When the PHLX was demutualized in January of 2004, VDM received 600 shares of Class A PHLX stock in exchange for its six PHLX seats. (Id. ¶ 12.) In December 2004, VDM sold these 600 shares to Benton's company, Defendant Benton Partners II, LLP ("BPII"). (Id. ¶ 12.) Subsequently, on August 22, 2005, pursuant to provisions of the Delaware General Corporation Law, VDM merged with, and into, Plaintiff Mill Bridge V, Inc. ("Mill Bridge V"). (Id. ¶ 13.) The merger agreement provided that all of the property, rights, and privileges of VDM vested in plaintiff Mill Bridge V. (Id. ¶ 14.)

### 4. Details of the Alleged Insider Trading Transaction

Defendant Benton became a member of the PHLX Board of Governors in the spring of 2003 and, at all relevant times, also served on the Executive Committee, the Business Conduct Committee, and the Demutualization Advisory Group. (Id. ¶ 40.) As part of the Demutualization Advisory Group, Benton was involved in the preparation and assembly of the Info Memo distributed in October 2003. (Id. ¶ 41.) According to the Second Amended Complaint, the Info Memo, aside from making the aforementioned affirmative representations about the state of the PHLX, did not include information pertaining to: (1) the existence and content of valuations performed of the PHLX, including the Kwok Li deal; (2) the "extant plans" to realize the value of the PHLX or assets of the PHLX in separate transactions; and (3) the prior relationships that Robert Gerard, WFG, and KBW had with the PHLX. (Id. ¶ 44.)

In mid-November 2004, BPII placed an "indication of interest" to acquire PHLX stock. (Id. ¶ 49.) On December 1, 2004, BPII made its first purchase of PHLX stock from former seat owner and current stockholder Richard Feinberg. During the negotiations, BPII did not disclose any information such as the underlying value of the PHLX and PHLX's current efforts to enter into deals. (Id. ¶ 50.)

VDM contacted Shareholder Services on December 1, 2004 in order to sell its Class A PHLX stock. (Id. ¶ 52.) Rather than informing VDM of the then-pending bids and advising VDM to post an "indication of interest" to sell, Shareholder Services, through its director Robert Kreszswick, directly contacted Defendant Benton and informed her that VDM wished to sell its stock. (Id.) Benton thereafter made contact with Janet Bennett, VDM's representative in Philadelphia, to indicate her interest in buying VDM's PHLX shares. (Id.) According to Plaintiff,

there were several bids for 100 shares each then pending on the books of Shareholder Services: (1) Daniel Carrigan having bid $10,000 on November 12, 2004; (2)William F. Rooney having bid $14,500 on November 12, 2004 for 100 shares and increasing his bid to $18,750 on November 30, 2004; (3) Richard A. Kirslis having bid $16,600 on November 23, 2004 for 100 shares; and (4) Scott Ruden having bid $17,000 on November 30, 2004. (Id. ¶ 53.)[2]

"As a result of VDM being informed that BPII was the sole bidder at the relevant time," VDM did not learn of other bids and how much had been paid for PHLX stock on other sales within the preceding thirty days, even though Shareholder Services had begun to show both bids and offers of stock on its website. (Id. ¶ 56.) Ultimately, VDM sold all 600 shares of PHLX stock to BPII for $13,000 per 100 shares. (Id. ¶¶ 56, 65.) The stock purchase was marked private. (Id. ¶ 57.)

During the December 15, 2004 meeting of the PHLX Board, a "freeze" was imposed on all PHLX stock transactions by PHLX Board members. (Id. ¶ 51.) From the date of January 2004 demutualization up until the December 15, 2004 freeze, BPII purchased approximately one half of all PHLX stock that was sold between the day of demutualization and the "freeze." (Id.)

### 5. Related Litigation

The demutualization and subsequent sale of PHLX led to a number of civil lawsuits, one of which was brought directly against Defendants Benton and BPII. Specifically, on September 5, 2005, Steven Mirow, current Plaintiff's counsel, filed a complaint on behalf of Richard Feinberg asserting insider trading claims against BPII and Benton. Compl., Feinberg v. Benton, Civ. A. No. 05-4847 (E.D. Pa. Sep. 9, 2005) ("Feinberg Complaint"); see also Feinberg v. Benton, No.

---

[2] The Second Amended Complaint lists several other bids, none of which were pending on or before the date of the December 10, 2004 transaction at issue.

CIV.A.05-4847, 2007 WL 4355408 (E.D. Pa. Dec. 13, 2007) (denying summary judgment). The

Feinberg Complaint claimed violation of Rule 10b-5 and control person liability against the

defendants in connection with a November 30, 2004 sale by Feinberg to BPII of 100 shares of

PHLX stock. The case proceeded to a non-jury trial. On July 2, 2008, the Court entered judgment

for the defendants on all claims.

### B.  Procedural History

On June 16, 2008, Mill Bridge V, LLC ("Mill Bridge LLC"), represented by Steven Mirow,

brought suit against BPII and Benton claiming a violation of section 10(b) of the Securities

Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5; seeking

rescission under section 29(b) of the Securities Exchange Act, 15 U.S.C. § 78cc(b), and alleging

control person liability under section 20(a) of the Exchange Act, 15 U.S.C. § 78t. The Complaint

alleged that BPII bought 600 shares of PHLX stock from VDM on December 10, 2004, without

disclosing material non-public information and that Mill Bridge LLC was the successor in interest to

VDM. Defendants moved to dismiss the complaint on various grounds and, in lieu of a response,

the plaintiff asked for additional time to obtain documents from VDM in the Netherlands and

determine if Mill Bridge LLC was the proper plaintiff. This Court dismissed the complaint without

prejudice and allotted a set period of time in which to file an amended complaint.

Plaintiff's counsel filed a new pleading entitled "First Amended Complaint" on October 20,

2008. This document was brought on behalf of current Plaintiff Mill Bridge V, Inc. and raised the

identical claims. Defendants again moved to dismiss. On April 30, 2009, the Court dismissed the

First Amended Complaint and ordered Plaintiff to file, within twenty days, a new complaint that

complied with the following directives:  (1) "Plaintiff, when addressing its insider trading claim

(Count I), shall specify, in accordance with Fed.R.Civ.P. Rule 9(b), the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4b, and appropriate case law, each alleged material misstatement or omission, and offer all specific, relevant facts that explain why each was misleading;" and (2) "As to Count III, Plaintiff shall set forth the specific provision of the Philadelphia Stock Exchange's Code of Conduct that was allegedly violated by Defendant Isabelle Benton." Order, <u>Mill Bridge V, Inc. v. Benton</u>, Civ. A. No. 08-2806 (E.D. Pa. Apr. 30, 2009).

Plaintiff filed the current Second Amended Complaint on May 20, 2009, adding Defendants James Kenkelen and Eileen White as transferees of some of the 600 shares of PHLX stock. The Second Amended Complaint re-asserted the three causes of action from the prior iterations of the document, and added a new claim under the Pennsylvania Securities Act, 70 Pa.C.S. §§ 1-401(a), 501(a). On June 4, 2009, Defendants moved to dismiss the Second Amended Complaint, Plaintiff responded, and both parties filed supplemental briefs. The Court now turns to a discussion of the Motion.

## II.    STANDARDS OF REVIEW

### A.    <u>General Standard of Review Under Rule 12(b)(6)</u>

Under Rule 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6); <u>see</u> <u>also</u> <u>Hedges v. United States</u>, 404 F.3d 744, 750 (3d Cir. 2005). In <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544 (2007), the United States Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Id.</u> at 555. Following the basic dictates of <u>Twombly</u>, the

Supreme Court, in <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937 (2009), subsequently defined a two-pronged approach to a court's review of a motion to dismiss. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u> at 1949. Thus, although "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." <u>Id.</u> at 1950. Second, the Supreme Court emphasized that "only a complaint that states a plausible claim for relief survives a motion to dismiss." <u>Id.</u> "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." <u>Id.</u> Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but not shown an entitlement to relief. <u>Id.</u>; <u>see also</u> <u>McTernan v. City of York, Pa.</u>, 577 F.3d 521, 530-31 (3d Cir. 2009).

Notwithstanding these new dictates, the basic tenets of the Rule 12(b)(6) standard of review have remained static. <u>DeFebo v. Andersen Windows, Inc.</u>, No. CIV.A.09-2993, 2009 WL 4268553, at *4 (E.D. Pa. Nov. 23, 2009); <u>Spence v. Brownsville Area Sch. Dist.</u>, No. CIV.A.08-626, 2008 WL 2779079, at *2 (W.D. Pa. Jul. 15, 2008). The general rules of pleading still require only a short and plain statement of the claim showing that the pleader is entitled to relief and need not contain detailed factual allegations. <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 233 (3d Cir. 2008). Further, the court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." <u>Buck v. Hampton Twp. Sch. Dist.</u>, 452 F.3d 256, 260 (3d Cir.

2006).  Finally, the court must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Pinkerton v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002).

**B.**    **Heightened Pleading Standard for section 10(b) and Rule 10b-5 Claims**

While the above-defined Rule 12(b)(6) standard applies generally to all motions to dismiss, Plaintiff's claims under Section 10(b) and Rule 10b-5 carry additional and more stringent pleading requirements.  Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") prohibits the use of fraudulent schemes or devices in connection with the purchase or sale of securities.  15 U.S.C. § 78j(b) (2000).  "Pursuant to this statutory authority, the [SEC has] promulgated Rule 10b-5, which creates a private cause of action for investors harmed by materially false or misleading statements."  In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 275 (3d Cir. 2006).  Rule 10b-5 prohibits, in connection with the purchase or sale of securities, the making of "any untrue statement of a material fact" or the omission of "a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5 (1951).

To state a claim under section 10(b) and Rule 10b-5, a plaintiff must allege:  (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005); In re Suprema, 438 F.3d at 275.  In assessing the sufficiency of section 10(b) pleadings, the court "accept[s] all factual allegations in the complaint as true," and "consider[s] the complaint in its entirety, as well as . . . sources courts ordinarily examine when ruling on Rule

12(b)(6) motions to dismiss." <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322-23 (2007).

Because Section 10(b) claims sound in fraud, however, plaintiffs must satisfy the heightened pleading standard of Federal Rules of Civil Procedure 9(b). Rule 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." FED. R. CIV. P. 9(b). This heightened pleading standard "'give[s] defendants notice of the claims against them, provide[s] an increased measure of protection for their reputations, and reduce[s] the number of frivolous suits brought solely to extract settlements.'" <u>Key Equity Investors, Inc. v. Sel-Leb Mktg., Inc.</u>, 248 Fed. Appx. 780, 784 n.5 (3d Cir. 1997) (quoting <u>In re Suprema</u>, 438 F.3d at 270). The standard is "relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control." <u>See In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1418 (3d Cir. 1996).

In addition to the requirements of Rule 9(b), a securities fraud plaintiff must also meet the heightened pleading standard of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4. The PSLRA was enacted to reduce the number of frivolous "'strike suits' aimed at achieving quick settlements," and established specific pleading mandates for several of the 10b-5 elements. <u>In re Campbell Soup Sec. Litig.</u>, 145 F. Supp. 2d 574, 584-85 (D.N.J. 2001). As to the first element, the PSLRA requires that a complaint set forth "each statement alleged to be misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with

particularity all facts on which that belief is formed." See 15 U.S.C. § 78u-4(b)(1); see also Key

Equity Investors, 246 Fed. Appx at 784; In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 147 (3d Cir.

2004). In other words, the complaint should set out the "who, what, when, where and how" of the

events at issue. In re Alphapharma, 372 F.3d at 148 (quotations omitted).

As to the second element of scienter, a plaintiff must "state with particularity facts giving

rise to a strong inference that the defendant acted with the required state of mind." Id. (quoting 15

U.S.C. § 78u-4(b)(2)). To do so, the complaint may allege: (1) "facts to show that defendants had

both motive and opportunity to commit fraud," or (2) "facts that constitute strong circumstantial

evidence of conscious misbehavior or recklessness." Id. (quotations omitted). The United States

Supreme Court has emphasized that a complaint gives rise to a "strong inference" of scienter "only

if a reasonable person would deem the inference of scienter cogent and at least as compelling as any

opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324.

In Cal. Pub. Employees' Ret. Sys v. Chubb Corp., 394 F.3d 126 (3d Cir. 2009), the Third

Circuit Court of Appeals summarized the interplay between the three standards established by Rule

12(b)(6), Rule 9(b), and the PSLRA, as follows:

> "[U]nless plaintiffs in securities fraud actions allege facts supporting their
> contentions of fraud with the requisite particularity mandated by Rule 9(b) and the
> Reform Act [PSLRA], they may not benefit from inferences flowing from vague or
> unspecific allegations – inferences that may arguably have been justified under a
> traditional Rule 12(b)(6) analysis." . . . . In other words, pursuant to this 'modified'
> Rule 12(b)(6) analysis, 'catch-all' or 'blanket' assertions that do not comply with the
> particularity requirements are disregarded.

Ifd. (internal citations omitted). If a complaint fails to meet the stringent pleadings requirements for

sustaining a § 10(b) claim, the "appropriate sanction . . . is dismissal." <u>Id.</u> (citing 15 U.S.C. § 78u-4(b)(3)(A)); <u>see also</u> <u>In re Rockefeller Ctr. Props., Inc. Sec. Litig.</u>, 311 F.3d 198, 224 (3d Cir. 2002).

## III.    DISCUSSION

Defendants now move to dismiss the entirety of the Second Amended Complaint on various grounds. First, Defendants seek dismissal of Plaintiff's two claims under Section 29(b) of the Exchange Act. Second, Defendants allege that the Rule 10b-5 claim is inadequately pled. Third, Defendants assert that the section 20(a) control person liability claim against Defendant Benton cannot stand. Finally, Defendants aver that Plaintiff's claims under the Pennsylvania Securities Act fail on multiple grounds. The Court addresses each argument individually.

### A.    <u>Claim Under Section 29(b) of the Securities Exchange Act (Counts IV and V)</u>

Counts IV and V of the Second Amended Complaint seek rescission of the December 2004 trade between VDM and BPII pursuant to section 29(b) of the Securities Exchange Act. Rule 29(b) states, in pertinent part:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, . . . [or] the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void.

15 U.S.C. § 78cc(b) (1990). "Section 29(b) itself does not define a substantive violation of the securities laws; rather, it is the vehicle through which private parties may rescind contracts that were made or performed in violation of other substantive provisions." <u>Berckeley Inv. Group, Ltd. v. Colkitt</u>, 455 F.3d 195, 205 (3d Cir. 2006). Plaintiffs invoking section 29(b) to void an Agreement

must establish that the contract they seek to void involved or will involve a prohibited transaction, that they are in contractual privity with respect to the disputed transaction, and that they are in the class of persons that the securities acts were designed to protect.  Id. (citing Reg'l Props., Inc. v. Fin. and Real Estate Consulting Co., 678 F.2d 552, 559 (5th Cir. 1982)).

Plaintiff now relies on the PHLX Code of Conduct to satisfy the prohibited transaction element of section 29(b) claim.  Specifically, he asserts the PHLX Code of Conduct in effect at the time relevant to this case required a "covered person" – i.e., one who was in possession of material information of the PHLX – to inform the PHLX Board when he or she wished to engage in any transaction connected to the PHLX.  The Board had to then given approval for that "covered person" to proceed on that transaction.  (Sec. Am. Compl. ¶¶ 83-105.)  Because Defendant Benton, as a member of the PHLX Board and thus a "covered person," never obtained clearance from the PHLX Board to engage in her proposed PHLX stock transaction, Plaintiff claims that she violated the PHLX Code of Conduct.  (Id. ¶¶ 100-103.)  According to Plaintiff, this failure "to comply with a rule or regulation made under the Securities Exchange Act in forming the contract of sale at issue herein provides the basis for Plaintiff to rescind said sale pursuant to Section 29(b) of the Act."  (Id. ¶ 104.)

Prior to addressing the viability of Plaintiff's claim, some background discussion of the PHLX's self-promulgated regulations is helpful.  In 1997, the PHLX adopted a written code of conduct ("PHLX 1997 Code of Conduct") that addressed, among other matters, dealings or transactions by "covered persons," which included members of the PHLX Board, PHLX officers,

and members of PHLX committees or groups – all of whom had access to material, non-public information.  (Sec. Am. Compl. ¶ 84.)  This Code was approved by the SEC as PHLX Rule 708. Order Granting Approval to Proposed Rule Change Relating to Amendments to Certificate of Incorporation and By-laws, Release No. 34-38960, 62 Fed. Reg. 45904-1 (Aug. 29, 1997).

Subsequently, on June 21, 2002, the PHLX filed with the SEC a proposed rule change to adopt a Seat Transaction Policy for Governors, Committee Members, and Associated Member Organizations.  (Sec. Am. Compl. ¶ 85); Order Approving Proposed Rule Change by the Philadelphia Stock Exchange, Inc. to Adopt a Seat Transaction Policy and Add Supplementary Material to PHLX Rule 708, Release No. 34-47389, 68 Fed. Reg. 9107-01 (Feb. 27, 2003).  Under the Policy, "before a Covered Person or their associated member organization could purchase or sell a Seat, the Covered Person [had to] notify the Exchange, in writing, which [would] convene the Special Committee on Governor and Committee Member Seat Transactions ('Special Committee')." (Pl.'s Resp. Mot. Dismiss, Ex. 1.)  Thereafter, the Special Committee would review the proposed seat transaction to determine if the covered person had any material confidential information and, if so, the Committee was empowered to take steps to protect the information from inappropriate disclosure.  (Id.)  This Policy also amended the previously-adopted PHLX Rule 708 – entitled "Acts Detrimental to the Interest and Welfare of the Exchange" – to make clear to Covered Persons that any violation of the Seat Transaction Policy constituted an act detrimental to the Exchange and was in violation of PHLX Rule 708.  (Sec, Am. Compl. ¶ 86); Release No. 34-47389, 68 Fed. Reg. 9107-01.  Via Release issued on February 27, 2003, the SEC again approved this proposed rule change. Release No. 34-47389, 68 Fed. Reg. 9107-01.

On May 20, 2004, subsequent to demutualization and the elimination of seats, the PHLX filed with the SEC another proposed rule change, this time seeking to rescind Commentary .01(f) to the previous Exchange Rule 708, which corresponded to the PHLX Code of Conduct policy statement on seat transactions. (Sec. Am. Comp. ¶ 91.) This commentary stated that:

> [a] member, member organization, or person associated with or employed by a member or member organization shall not engage in acts detrimental to the interest or welfare of the Exchange.
>
> . . . .
>
> .01 Acts which could be deemed detrimental to the interest or welfare of the Exchange include, but are not limited to, the following:
>
> . . . .
>
> (f) Any action by a member of the Board of Governors or any Exchange Committee, or by any member organization associated with such member, which contravenes the Seat Transaction Policy contained in Article V of the Code of Conduct for Governors and Committee Members.

Notice of Filing and Immediate Effectiveness of Proposed Rule by the Philadelphia Stock Exchange, Inc. Relating to the Rescission of Commentary .01(f) to Exchange Rule 708, Release No. 34-49748, 69 Fed. Reg. 30000-01 (May 26, 2004). When approving this requested rule change, the SEC recognized that the basis for rescinding this commentary was to acknowledge that ownership in the PHLX was no longer represented through seats, but rather through shares, making the reference to seat ownership in Commentary .01(f) to Rule 708 obsolete. Id.; (Sec. Am. Compl. ¶¶ 90-92.)

As represented by Defendants, however, just prior to this last rule change, the PHLX adopted a new Code of Conduct on April 21, 2004 ("2004 Code of Conduct"). (Defs.' Mem. Supp. Mot. Dismiss 20, Ex. B.) This 2004 Code of Conduct made no reference to a Covered Person's

obligation to obtain approval before purchasing or selling securities on the PHLX.  Section III.3

stated simply, "[c]overed Persons shall not purchase or sell Exchange Securities based upon

Material Confidential Information."  (Id. § III.3.)  Further, section V.1 provided that, "[a]ll Covered

Persons are required to execute an annual certification of compliance with this Code of Conduct for

submission to the General Counsel . . . ."  (Id. § V.1.)  Notably, the 2004 Code of Conduct was

never noticed in the Federal Register or approved by the SEC.

 This factual history leads to multiple arguments by the parties with respect to Plaintiff's

section 29(b) claim.  First, while both sides agree that the 2004 Code of Conduct did not require any

Board approval for PHLX stock transactions, they disagree on whether that Code of Conduct ever

became effective.  Plaintiff contends that, under 15 U.S.C. § 78s(b)(1),[3] proposed rules by self-

regulatory organizations are not effective without publication in the Federal Register and approval

by the SEC.  Defendants respond that the 2004 Code of Conduct was a limited provision applying

only to PHLX Board members, whereas rule-making involves the promulgation of concrete

proposals declaring "generally-applicable policies" binding on the affected public generally.  (Defs.'

Reply Br. 6); see also PBW Stock Exch., Inc. v. SEC, 485 F.2d 718, 732 (3d Cir. 1973) (noting that

rulemaking declares "generally applicable policies").  Second, the parties debate whether, in the

event that the 2004 Code of Conduct was actually invalid, the previous Seat Transaction Policy

---

[3]  Under this provision, all self-regulatory organizations must file with the SEC all proposed rules and changes to existing rules, and all proposals must contain a concise general statement of the basis and purpose of the proposed change.  Upon filing the proposed rule change, the SEC must publish notice of it in order to give interested persons an opportunity to comment on the change. Ultimately, the rule change does not taken effect unless approved by the SEC or otherwise permitted.  See 15 U.S.C. § 78s(b)(1) (2000).

remained effective, notwithstanding demutualization and the elimination of any such "seats" on the PHLX. Plaintiff argues that the May 2004 elimination of the reference to "seats," effectively converted the Seat Transaction Policy into a Stock Transaction Policy applicable to all "covered persons." Defendants, on the other hand, contend that the 1997 Code of Conduct and ensuing Seat Transaction Policy, which pertained exclusively to seats, was effectively nullified or rendered obsolete by demutualization.

While these arguments raise interesting legal questions, the Court declines to resolve them in light of a fundamental shortcoming in Plaintiff's basic legal theory. As set forth above, section 29(b) only permits rescission of contracts that are "in violation of any provision of this chapter or of any rule or regulation thereunder." 15 U.S.C. § 78cc(b). Plaintiff points to no express "provision" of the Exchange Act that was violated by the December 10, 2004 transaction, but rather claims that Defendant Benton's violation of the PHLX Exchange Rule, as a "rule or regulation thereunder," serves as the basis for rescission. This Court, however, finds that exchange rules do not fall within the ambit of section 29(b) for two reasons.

First, section 29(b) "generally provides that contracts made in violation of any provision of the Act, or any rule or regulation *promulgated by the Securities and Exchange Commission (SEC)* shall be void." 14 WILLIAM MEADE FLETCHER, FLETCHER CYC. CORP. § 6869 (2009) (emphasis added). An example of such a rule or regulation that has been the subject of 29(b) litigation is Rule 10b-5, which was created by the SEC pursuant to its authority under the Exchange Act. See Berckeley, 455 F.3d at 205-06. By contrast, the 1997 Code of Conduct and its accompanying amendments in 2003 – all of which were part of the PHLX by-laws – were not rules "promulgated

by the Securities Exchange Commission," but rather were "rules of an exchange," which are statutorily defined as

> the constitution, articles of incorporation, bylaws, and rules, or instruments corresponding to the foregoing, of an exchange, association of brokers and dealers, or clearing agency, respectively, and such of the stated policies, practices, and interpretations of such exchange, association, or clearing agency as the Commission, by rule, may determine to be necessary or appropriate in the public interest or for the protection of investors to be deemed to be rules of such exchange, association, or clearing agency.

15 U.S.C. § 78c(27). Such rules were promulgated by the organization itself pursuant to its authority as a self-regulating organization. 15 U.S.C. § 78f(b). As a stock exchange's rule is not a rule formulated by either Congress or the SEC, it thus follows that it cannot be "a rule or regulation" promulgated under the Securities Exchange Act for purposes of section 29(b).

Second, section 29(b) cannot be interpreted to create a private cause of action to enforce violations of an exchange's rules. Although this Court has found no cases directly addressing this issue, Third Circuit jurisprudence outside the context of section 29(b) has rejected any type of substantive cause of action based on a violation of an exchange's own rules. In <u>Walck v. Am. Stock Exch., Inc.</u>, 687 F.2d 778 (3d Cir. 1982), the Third Circuit considered whether an investor had an implied right of action for damages against a registered stock exchange, under section 6 of the Exchange Act, for a violation of the exchange's own rules. <u>Id.</u> at 787. The court declined to find that any such right of action existed. <u>Id.</u> at 788. The plaintiff-investor then argued that he had an implied right of action under the exchange's rules themselves, without regard to section 6. <u>Id.</u> at 788. The court found that "[plaintiff] overlooks the reality that *the Exchanges and not Congress*

*promulgated the rules*; and we perceive no basis for an inference that the Exchanges in their quasi-legislative capacity intended to subject themselves to damages for non-enforcement." Id. at 788 (emphasis added); see also Carapico v. Phila. Stock Exch., No. CIV.A.93-3066, 1994 WL 50295, at *2 (E.D. Pa. Feb. 14, 1994) (declining to find cause of action for an exchange's violation of its own rules), aff'd 43 F.3d 1460 (3d Cir. 1994); Ferreri v. Mainardi, 690 F. Supp. 411, 413 (E.D. Pa. 1988) ("[i]t is well established in this circuit that there is no private right of action against a stock exchange under section 6 for a stock exchange's refusal or inability to enforce these rules).

Following Walck, courts in this circuit have "unanimously refused to recognize any private right of action for violation of a stock exchange rule." In re Farmers Group Stock Options Litig., No. CIV.A.88-4994, 1989 WL 73245, at *3 (E.D. Pa. Jul. 5, 1989) (citing cases). For example, in Jacobson v. Merrill Lynch Pierce Fenner & Smith, Inc., 605 F. Supp. 510 (W.D. Pa. 1984), rev'd on other grounds, 797 F.2d 1197 (3d Cir. 1986), cert. granted, judgment vacated, 482 U.S. 923 (1987), the plaintiff alleged a cause of action against the defendant brokerage firm and broker-dealer for violation of the New York Stock Exchange Rules. Id. at 511. The court, citing to the United States Supreme Court decisions in Touche Ross & Co. v. Redington, 442 U.S. 560 (1979) and Transamerica Mtg. Advisors, Inc. v. Lewis, 444 U.S. 11 (1979), determined that "[n]o provision of the Securities Exchange Act explicitly provides for a private action for violations of stock exchange rules." Id. at 512. Other cases have since followed suit. See, e.g., Farmers Group, 1989 WL 73245, at *3 (finding no private right of action for violation of a PHLX rule); Witt v. Pierce, Fenner & Smith, Inc., 602 F. Supp. 867, 869 (W.D. Pa. 1985) (dismissing two counts of complaint on the ground that "there is no private right of action against defendants, either express or implied, under

the New York Stock Exchange and NASD Rules."); <u>Miller v. E.W. Smith Co.</u>, 581 F. Supp. 817, 820 (E.D. Pa. 1983) (refusing to imply a cause of action based on NASD or similar stock exchange rules); <u>accord</u> <u>Jablon v. Dean Witter & Co.</u>, 614 F.2d 677, 680 (9th Cir. 1980) (finding no congressional intent to provide a private cause of action for a defendant's violation of an exchange rule).[4]

In the case at bar, Plaintiff does not bring a substantive cause of action for contract damages premised on Defendant's alleged violation of PHLX Exchange Rule 708, but instead relies on section 29(b) to seek the equitable remedy of rescission based on that alleged violation. As the Court noted earlier, however, Section 29(b) "is the vehicle through which private parties may rescind contracts that were made or performed in violation of *other substantive provisions*." <u>Berckeley</u>, 455 F.3d at 205 (emphasis added). It is an "adjunct to the other remedies provided by the Securities and Exchange Act of 1934." <u>Occidental Life Ins. Co. v. Pat Ryan & Assoc.</u>, 496 F.2d 1255, 1266-67 (4th Cir.), <u>cert. denied</u>, 419 U.S. 1023 (1974). Thus, "before reaching the voiding remedy of § 29(b), there must first be an underlying securities violation, such as a transaction contrary to § 10(b) and Rule 10b-5." <u>Nat'l Union Fire Ins. Co. v. Turtur</u>, 892 F.2d 199, 206 n.4 (2d Cir.1989).

As discussed, however, a violation of an exchange rule is not an underlying securities

---

[4] Notably, the exchanges bear the obligation of enforcing their own rules. This obligation is defined in section 19 of the Exchange Act: "absent reasonable justification or excuse," an exchange must enforce member compliance with the Act, the SEC regulations, and the rules of the exchange." 15 U.S.C. § 78s(g)(1)(A). This section also "provides for SEC supervision of the exchanges' self-regulatory power to assure that they fulfill their statutory responsibilities." Bernard M. Plum, "Exchange Liability Under Section 6 of the Securities Exchange Act: the Eligible Plaintiff Problem, 78 COLUM. L. REV. 112, 114 (1978) (citing 15 U.S.C. § 78s).

violation that can give rise to a cause of action.[5]  In turn, since a violation of an exchange rule does not permit recovery of damages, it could not logically permit a plaintiff to obtain the alternative equitable remedy of rescission through the vehicle of section 29(b).  Under this reasoning, Plaintiff cannot now use section 29(b) to rescind its sale of securities to BPII on the grounds that Benton contravened PHLX Rule 708.  Accordingly, the Court dismisses Plaintiff's section 29(b) claims (Counts IV and V).[6]

## B.     Rule 10b-5 Claim

Defendants next seek dismissal of the Rule 10b-5 claims on the theories that:  (1) they are barred by the statute of limitations; (2) the averments based on "information and belief" lack the support required by the PSLRA; (3) Plaintiff has failed to properly allege any material misstatement or omission; (4) Plaintiff has not alleged facts giving rise to a strong inference of scienter; (5) the Second Amended Complaint contains no facts showing VDM's reliance on trade-related misstatements or omissions; and (6) the Second Amended Complaint lacks facts showing either

---

[5]  Although Plaintiff does not expressly make this argument, it suggests that because the Seat Transaction Policy was designed to protect investors from insider trading, a private cause of action should be available.  As the Supreme Court has emphasized, however, "'the fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person.'"  Touche Ross, 442 U.S. at 568 (quoting Cannon v. Univ. of Chicago, 441 U.S. 677, 688 (1979)).

[6]  Defendants also move to dismiss these Counts on several other grounds including: (1) Plaintiff's failure to specify the precise provision of the PHLX Code of Conduct; (2) the unavailability of rescission where the parties cannot be returned to their status prior to the alleged wrongdoing; (3) waiver of rescission based on Plaintiff's four year delay in seeking this remedy; and (4) Plaintiff's concession in paragraph 74 of the Second Amended Complaint that "rescission is no longer possible."  Having already dismissed these Counts on other grounds, the Court declines to address these arguments.

economic loss or loss causation.  The Court separately considers each theory.

### 1.    Whether the Rule 10b-5 Claim is Time-Barred

Defendants first contend that the Rule 10b-5 claims must initially be dismissed under the applicable statute of limitations.  Taking all inferences in the light most favorable to Plaintiff, the Court finds no definitive time bar.

The statute of limitations for Rule 10b-5 claims is governed by 28 U.S.C. § 1658(b), which provides that such a claim may be brought no later than the earlier of either (1) two years after discovery of the facts constituting the violation; or (2) five years after the actual violation.  28 U.S.C. § 1658(b) (2002); see also In re Merck & Co., Inc. Sec. Derivative & "ERISA" Litig., 543 F.3d 150, 160-61 (3d Cir. 2008).  "Whether the plaintiffs, in the exercise of reasonable diligence, should have known of the basis for their claims depends on whether they had 'sufficient information of possible wrongdoing to place them on 'inquiry notice' or to excite 'storm warnings' of culpable activity.'"  Id. at 161 (quoting Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt., L.P., 435 F.3d 396, 400 (3d Cir. 2006; In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1325 (3d Cir. 2002)).  This is an objective question, meaning that an investor is not on inquiry notice until a "'reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning.'"  Id. (quoting In re NAHC, 306 F.3d at 1325; Mathews v. Kidder, Peabody & Co., 260 F.3d 239, 252 (3d Cir. 2001)).

In the recent case of In re Merck & Co., supra, the Third Circuit addressed what type of information suffices to put a plaintiff on inquiry notice of a Rule 10b-5 claim.  543 F.3d at 161.  It noted that, "[although] inquiry notice may be triggered by evidence alerting an investor to the

probability of wrongdoing, . . . inquiry notice may be triggered by sufficient information of possible wrongdoing. This implies that a probability, in the sense of a nearly certain likelihood, of wrongdoing is not necessary to trigger storm warnings in this circuit." Id. at 164. The court recognized and reaffirmed prior cases wherein it found that news articles, press releases, and registration statements may put investors on notice of securities fraud claims. Id. at 163. Adopting reasoning proposed by the Seventh Circuit, however, the court remarked that, "'[t]he facts constituting [inquiry] notice must be sufficiently probative of fraud – sufficiently advanced beyond the stage of a mere suspicion, sufficiently confirmed or substantiated – not only to incite the victim to investigate but also to enable him to tie up any loose ends and complete the investigation in time to file a timely suit.'" Id. at 164 (quoting Fujisawa Pharm. Co., Ltd. v. Kapoor, 115 F.3d 1332, 1335 (7th Cir. 1997)). "In other words, simply stating that a smattering of evidence hinted at the possibility of some type of fraud does not answer the question whether there was '*sufficient information* of possible wrongdoing . . . to excite storm warnings of culpable activity' under the securities laws.'" Id. (emphasis in original) (quotations omitted). Ultimately, the Third Circuit, in Merck, concluded that the FDA's public allegations of misrepresentations by Defendant Merck in its consumer advertisements, lawsuits alleging consumer fraud and products liability, and a *New York Times* article discussing the drug were not storm warnings of the securities fraud allegedly resulting from withdrawal of a drug from the market. Id. at 170-72.

In the case at bar, Defendants concede that five-year limitations period has not yet expired, but argue that Plaintiff was placed on clear inquiry notice by several sources of information to investigate and bring its claims more than two years prior to the filing of the June 16, 2008

Complaint in this case.  First, they contend that Plaintiff's counsel, Steven Mirow, Esq., sued

Defendants Benton and BPII for insider trading on September 9, 2005, in connection with the

Feinberg trade, which occurred approximately one week before the trade at issue in the current case.

Mr. Mirow was also involved in three other cases connected with the demutualization and

subsequent sale of the PHLX.  As such, Defendants claim that Plaintiff could have learned of the

alleged securities fraud against it from either a conversation with Mr. Mirow or a review of the

public docket of the aforementioned Feinberg matter.  Second, Defendants, attaching a series of

news articles, argue that "the press often reported on the PHLX's difficulties, and its efforts to find a

partner who would deliver capital to the exchange, and reported on the success of those efforts in

2005."  (Defs.' Mem. Supp. Mot. Dismiss 28 and Ex. D.)

The Court finds Defendants' arguments unconvincing.  The Feinberg case provided no clear

"storm warnings," as this Plaintiff was uninvolved in the matter.  Although the docket was publicly

available, Defendants point to no actual publication of or reporting on the case, such that a

reasonable investor should have been aware of it.  To hold otherwise would require investors to

scour random court dockets for mentions of the parties with whom they dealt.  Moreover, the mere

fact that the plaintiff in Feinberg and Plaintiff in this matter share the same counsel does not create

storm warnings, particularly absent any showing as to when Plaintiff retained Mr. Mirow and what

type of information he shared about his prior client.

In addition, the press reports are not probative for several reasons.  First, when ruling on a

motion to dismiss, a court is typically limited to "the allegations contained in the complaint, exhibits

attached to the complaint and matters of public record."  Pension Benefit Guar. Corp. v. White

Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1999). While a court can consider the text of an undisputedly authentic document that is integral to or explicitly relied upon in a plaintiff's claim, a district court may not otherwise consider matters extraneous to the pleadings. In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997). Newspaper articles are publicly available, but they are not "matters of public record" for purposes of consideration on a motion to dismiss. Waterfront Renaissance Assoc. v. City of Phila., No. CIV.A.07-1045, 2008 WL 862705, at *4 n.8 (E.D. Pa. Mar. 31, 2008); In re Astea Int'l Inc. Sec. Litig., No. CIV.A.06-1467, 2007 WL 2306586, at *8 (E.D. Pa. Aug. 9, 2007). Nor are the documents integral to Plaintiff's claim.

Second, even assuming that the Court could consider the newspaper articles, those referenced by Defendants were all issued six months or more past the trade date and simply discuss more recent investors in the PHLX. They do not address the PHLX Board's efforts to seek investors or engage in talks with potential strategic partners prior to the December 2004 transaction at issue.

In short, the Court cannot, at this stage of the litigation, find that Plaintiff had "sufficient information of possible wrongdoing" to excite "storm warnings" of culpable activity by the Defendants in this case. While subsequent discovery may reveal otherwise, the Court, taking all inferences in the light most favorable to Plaintiff, declines to dismiss the Rule 10b-5 claim on statute of limitations grounds.

### 2. Whether the Information and Belief Paragraphs Must Be Stricken

Defendants next argue that four paragraphs in the Second Amended Complaint are improperly pled on "information and belief." Under the strict pleading standards of Rule 9(b) and the PSLRA, Defendants contend that these paragraphs must be disregarded for purposes of the

Motion to Dismiss.

In the Third Circuit, pleadings made on information and belief satisfy the PSLRA only when a plaintiff pleads with particularity sufficient facts to support alleged beliefs. Cal. Pub. Employees' Ret. Sys. v. The Chubb Corp., 394 F.3d 126, 145-46 (3d Cir. 2004). "That is, when allegations are made on information and belief, the complaint must not only state the allegations with factual particularity, but must also describe the sources of information with particularity, providing the who, what, when, where and how of the sources, as well as the who, what, when, where and how of the information those sources convey." Inst. Investors Group v. Avaya, Inc., 564 F.3d 242, 253 (3d Cir. 2009). "Generic and conclusory allegations based on rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard of 15 U.S.C. § 78u-4(b)(1)." Chubb, 384 F.3d at 155.

The Third Circuit has also set forth the precise standards for which documentary evidence relied upon in an allegation must be pled. Id. at 147. Failure to identify specific documents on which allegations in a complaint rely "is fatal to their ability to meet the pleading requirements set forth in the PSLRA." Clark v. Comcast Corp., 582 F. Supp. 2d 692, 705 (E.D. Pa. 2008). "Reliance upon alleged documents which are undated, unquoted, undescribed, and unattached amounts to nonspecific allegations, at best." Id. (quoting Klein v. Autek Corp., No. CIV. A.01-5751, 2004 WL 3635650, at *7 (D.N.J. Jun. 30, 2004), aff'd, Klein v. Autek Corp., 147 Fed. Appx. 270 (3d Cir. 2005). Further, "a plaintiff relying on internal reports must 'specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them.'" Chubb, 394 F.3d at 147 (quoting In re Scholastic Corp. Sec. Litig., 252 F.3d 63,

72-73 (2d Cir. 2001)).

In the present matter, the four challenged paragraphs of the Second Amended Complaint state as follows:

53.　　Upon information and belief, as well as reviewing all records available as to the bids pending at the relevant time to purchase PHLX stock, there were at least four (4) bids for 100 shares each then on the books of Shareholder Services: William F. Rooney having bid $14,500 on 11/12/2004 for 100 shares had increased his bid on 11/30/2004 to $18,750, a 28% increase in less than 3 weeks; Richard A. Kirslis having bid $16,600 on 11/23/2004 for 100 shares had increased his bid on 12/08/2004 to $20,000, a 20% increase in 2 weeks; Scott Ruden bid $17,000 on 11/30/2004 but shortly into 2005 was bidding over $30,000 per 100 shares; on 12/14/2004 Ralph DiDonato bid $20,000; and on 12/15/2004 Richard Ross bid $20,500 which was increased to $22,000 on 1/3/2004.  The only low bid pending was Daniel Carrigan's $10,000 bid.  Everyone else was increasing their bids to buy PHLX stock and not very much stock was being offered.
. . . .

55　　Upon information and belief, Benton was able to cause Shareholder Services to wrongfully direct the offer by VDM to BPII by reason of her position on the PHLX Board just as the refusal of Robert Kreszswick to produce any of the information demanded by way of the subpoena issued in connection with his deposition in the Feinberg Case was to assist Benton and to hide his involvement in the matter.
. . . .

57.　　Plaintiff has done an investigation into the conduct of its employees and agents in connection with the stock sale and determined that no one acting on behalf of VDM requested that the stock transaction with BPII be marked private.  Upon information and belief, Benton wanted to have the stock purchase from VDM marked as private so that no one would ever be able to learn what price BPII had paid for VDM's PHLX stock to avoid the possibility that someone would then inform VDM that VDM had not been paid fair value for its stock nor even close to fair value.
. . . .

62.　　Upon information and belief, as set forth in the preceding as to the then pending bids for PHLX stock, or if this time Shareholder Services will be

compelled to produce its records as to bids made for PHLX stock at the relevant times, Benton's explanation for how Benton arrived at the price Benton offered to pay to buy VDM's stock will be shown to be knowingly false as taking an average of bids of at least $16,000 and up to $20,000 just will not yield an average of $12,5000. The Shareholder Services' records will also show that there was no reason other than favoritism for diverting the VDM offer to sell to Benton as Benton, assuming arguendo Benton even had a bid pending, was not the highest bidder. The basis for the assertion is that it is doubtful that Benton even had a bid pending at the time VDM offered its stock for sale is that Shareholder Services is a division of a stock exchange. When bids or offers are made at an exchange, the date and time at which such are made must be noted because the first in time of bids or offers of the same amount get filled first. Benton only had one bid for 100 shares of PHLX stock and that got filled with the purchase from Feinberg. Bids do not get "continued" after being filled; the bid terminates. A new bid must be reentered and when reentered the date and time noted, which did not occur here.

(Sec. Am. Compl. ¶¶ 53, 55, 57, 62.)

As to paragraph 53, Plaintiff's compliance with the established pleadings requirements is questionable. Nonetheless, the Court errs on the side of not disregarding this paragraph. Plaintiff states that the assertions are made "[u]pon information and belief, *as well as reviewing all records available as to the bids pending at the relevant time to purchase PHLX stock*." (Sec. Am. Compl. ¶ 53 (emphasis added).) Although Plaintiff does not identify precisely who prepared these records and when they were prepared, Plaintiff does explain that these were PHLX internal documents of pending bids and describes in detail the content of these records, including who made the bids, the date they were made, the amount in which they were made, and the percentage increase in the bids over time. Accordingly, the Court – albeit with some hesitation – deems this paragraph sufficiently specific to survive the Rule 9(b) and PSLRA pleading standards.

As to the remaining three paragraphs, however, the Second Amended Complaint cites no

facts or sources to bolster the bare allegations contained therein. For example, in paragraph 55, Plaintiff does not explain either how the referral of the VDM offer to BPII was wrongful or the basis for any belief that Benton had control over Shareholder Services simply by virtue of her Board position. In paragraph 57, Plaintiff does not reveal any source, confidential or otherwise,[7] for its belief that Defendant Benton either was the cause of the VDM-BPII trade being marked private or sought to hide information about the purchase price. Finally, in paragraph 62, Plaintiff surmises that there was no reason other than favoritism for diverting the VDM offer to sell to Benton and only speculates that "it is doubtful" that Benton had a bid pending at the time of the offer. To support this allegation, Plaintiff offers nothing more than a generic description, with no accompanying source or document citation, as to how the bidding process works at the PHLX. See Clark, 582 F. Supp. 2d at 705 (rejecting as "plainly insufficient" plaintiffs' "generic description" of how budget and subscriber documents were purportedly compiled and reviewed at Comcast).

In an effort to avoid dismissal of these averments, Plaintiff argues that its "information and belief" paragraphs can be easily and quickly resolved by unsealing what was presented to this Court in the unrelated case of Pennmont v. Wallace, Civ. A. No. 06-1646 (E.D. Pa.). Plaintiff asserts "this Court would [then] have before [it] actual documents as well as testimony supporting all of plaintiff's allegations herein." (Pl.'s Resp. Mot. Dismiss 29.) Plaintiff's subsequent proffer of what those documents might show, however, fails to identify any information that would bolster the

_____

[7] Although a complaint need not reveal the names of confidential sources, a complaint must at least describe each confidential source "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." Chubb, 394 F.3d at 155.

averments set forth in the four challenged paragraphs.  Moreover, Plaintiff's pleading burden is not

satisfied by a post hoc argument made in a brief responding to a dispositive motion; rather Plaintiff

was required to put a description of such documents in the Second Amended Complaint and explain

how such documents form the basis for its various theories and beliefs.[8]  See 15 U.S.C. § 78u-

4(b)(1) ("if an allegation regarding the statement or omission is made on information and belief, the

complaint shall state with particularity all facts on which that belief is formed.").

In short, paragraphs 55, 57, and 62 of the Second Amended Complaint have not been pled

with the required particularity.  Hence, the Court declines to consider them when deciding the

remainder of the Motion to Dismiss.

### 3.　　Whether Plaintiff Has Properly Alleged a Material Misstatement or Omission

As noted above, the first element of a Rule 10b-5 claim requires that the plaintiff prove a

material misrepresentation or omission by the defendant.  Stoneridge Inv. Partner, LLC v.

Scientific-Atlanta, 552 U.S. 148, 157 (2008).  In order to plead this element, the PSLRA provides

that a Section 10(b) claim must "specify each statement alleged to have been misleading," and state

"the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b) (1)(B) (1998).

Under Rule 9(b), Plaintiffs must "identify the source of the allegedly fraudulent misrepresentation or

_____

[8]  Throughout its Response, Plaintiff also makes reference to a case filed and recently settled in
Delaware Chancery Court, entitled Ginsburg v. The Phila. Stock Exch..  According to Plaintiff,
that case involved a class action by owners of Class A stock from April 20, 2005 to June 20,
2007, predicated on an alleged breach of fiduciary duty by the PHLX Board of Governors in
rejecting the bid by Archipelago Holdings to buy the PHLX.  (Pl.'s Resp. Mot. Dismiss 6.)
Despite repeatedly mentioning this action throughout various portions of its brief, however,
Plaintiff fails to adequately and clearly explain how it has any bearing on the present action.  As
such, the Court disregards these references.

omission." In re Suprema, 438 F.3d at 276 (quotation omitted).

In addition, to survive a motion to dismiss, the misstatements or omissions alleged by a plaintiff must be material to the reasonable investor. There must be a "substantial likelihood that, under all the circumstances, the [statement or omission] would have assumed actual significance in the deliberations of the reasonable shareholder." In re Aetna Inc. Sec. Litig., 34 F. Supp. 2d 935, 945 (E.D. Pa. 1999) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)). "The issue is whether there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available to that investor." Majer v. Sonex Research, Inc., 541 F. Supp. 2d 693, 704 (E.D. Pa. 2008) (citing Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988); Shapiro v. UJB Fin. Corp., 964 F.2d 272, 280 n.11 (3d Cir. 1992)). Information is not material if it is speculative, unreliable, or contingent. In re Rockefeller Ctr. Props., Inc. Sec. Litig., 184 F.3d 280, 290 (3d Cir. 1999).

A thorough review of the Second Amended Complaint reveals three alleged misstatements and five alleged omissions by Defendants which form the basis for Plaintiff's Rule 10b-5 claim. The Court addresses them individually.

### a. The Alleged Misstatements

The Second Amended Complaint appears to describe three misstatements by Plaintiff.[9] The

_____

[9] This Court's Order of April 30, 2009 expressly stated that "Plaintiff, when addressing its insider trading claim (Count I), shall specify, in accordance with Fed.R.Civ.P. Rule 9(b), the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4b, and appropriate case law, each alleged material misstatement or omission, and offer all specific, relevant facts that explain why each was misleading." Order, Mill Bridge v. Benton, Civ. A. No. 08-2806 (Apr. 30, 2009). The Second Amended Complaint still fails to clearly enumerate the precise misstatements, instead melding them with its other factual discussion. As such, this Court extracts the purported

first two, contained within the 2003 Info Memo, purportedly misrepresented: (1) the financial state and value of the PHLX, claiming that in the near future the PHLX might be compelled to cease operations unless it received an infusion of capital; and (2) the value of what could be realized from a seatholder's prosecution of a claim for appraisal rights in Delaware County, claiming that a PHLX seat owner's decision to opt out of demutualization and pursue state law appraisal rights would probably result in a net out of pocket loss to that seat owner. (Sec. Am. Compl. ¶¶ 29(g), 42, 44.) The third misstatement involves Defendant Benton's alleged misleading of VDM's representative, with the help of Robert Kreszswick from Shareholder Services, as to the market for the trading of Class A PHLX stock at the time when VDM sought to sell its stock. (Id. ¶ 64.)

None of these alleged misstatements can be the basis for imposing Rule 10b-5 liability on Defendants. First, as to the Info Memo misstatements, the Second Amended Complaint asserts only that "[a]s a member of the Demutualization Advisory Group, Benton was one of several individuals responsible for determining what information was needed for the Info Memo and assembling it. To do so required working with senior PHLX management, SPDE, and consultants to the PHLX . . ." (Id.) Such an argument, however, necessarily relies on the "group pleading doctrine," which is "a judicial presumption that statements in group-published documents including annual reports and press releases are attributable to officers and directors who have day-to-day control or involvement in regular company operations." Winer Family Trust v. Queen, 503 F.3d 319, 335 (3d Cir. 2007). "Under the doctrine, where defendants are insiders with such control or involvement, their specific connection to fraudulent statements in group-published documents is unnecessary." Id. The Third

---

misstatements to the best of its ability.

Circuit, however, has expressly found that the group pleading doctrine did not survive the enactment of the PSLRA and, thus, "is no longer viable in private securities actions." Id. at 337. "Absent group pleading, Plaintiffs must attribute at least one statement to each of the Defendants against whom a violation of Rule 10b-5(b) is alleged." In re DVI, Inc. Sec. Litig., No. CIV.A. 03-5336, 2005 WL 1307959, at *7 (E.D. Pa. May 31, 2005).

In this case, the Second Amended Complaint fails to allege what, if any, Defendant Benton's precise participation was in the Info Memo's production and/or how Benton could be considered the source of any statements within the Info Memo. Indeed, nothing in this document suggests either that Benton wrote or proposed the inclusion of these two statements or that she exercised control over the preparation of the document. In fact, according to the testimony cited by Plaintiff in its brief, Benton specifically testified that her Committee was not involved in writing the document. (Pl.'s Sur-reply Br. 13.) As Plaintiff has failed to attribute either of these alleged misstatements directly to Defendant Benton, they cannot serve as the basis for Rule 10b-5 liability.[10]

As to the third misstatement – Benton's alleged misrepresentation of the market for the trading of Class A PHLX stock to VDM's representative – the Court likewise finds no basis for attributing it to Defendants. According to the Second Amended Complaint, after VDM informed Shareholder Services of its indication of interest to sell, director Robert Kreszswick contacted Defendant Benton to see if she wanted to purchase the stock. Benton then contacted Janet Bennett, VDM's representative, to indicate her interest in buying VDM's PHLX shares. (Sec. Am. Compl. ¶

---

[10]   In addition, the Court notes that although Plaintiff paraphrases a portion of the Info Memo, it neither attaches the Info Memo nor quotes from it. As noted above, "[r]eliance upon alleged documents which are undated, unquoted, undescribed, and unattached amounts to nonspecific allegations, at best." Klein, 2004 WL 3635650, at *7.

52.)  The Second Amended Complaint does not charge Benton with either directly or indirectly

misrepresenting to Bennett that BPII was the only potential buyer for PHLX shares.[11]  In fact, the

Second Amended Complaint concedes that, as of December 1, 2004 – prior to the consummation of

the trade at issue – indications of "interest" to buy or sell began to be displayed on a public web site

maintained by the PHLX.[12]  (Sec. Am. Compl. ¶ 28.)  Given the public availability of this

information, any contrary representation of fact cannot be deemed to be material to a reasonable

investor.

Finally, any speculation by Plaintiff that Benton exercised some unspecified power to direct

Shareholder Services to put VDM in contact with her is just that – speculation without any

---

[11]  Notably, the Second Amended Complaint indicates only that Kreszswick directed the offer by
VDM to BPII.  In paragraph 56, it states that "[a]s a result of VDM being informed that BPII by
Benton was the sole bidder at the relevant time, VDM did not learn of other bids and how much
had been paid for PHLX stock on other sales within the preceding thirty days."  (Sec. Am.
Compl. ¶ 56.)  It does not reveal who so "informed" VDM.

[12]  Later in the Complaint, Plaintiff argues that the fact that Shareholder Services was posting
these bids and offers on its website was neither publicized nor known by shareholders.  (Sec.
Am. Comp. ¶ 56.)  The Third Circuit, however, has held that a Defendant may establish that an
investor knew or had reason to know that a misrepresentation was, in fact false.  Semernko v.
Cendant Corp., 223 F.3d 165, 179 n.8 (3d Cir. 2000).  As a sophisticated investor, VDM is hard-
pressed to argue, without any factual specificity, that it was precluded from determining the
available bids on the market.  See Rocher Bros., Inc. v. Rhoades, 491 F.2d 402, 409 (3d Cir.
1973) (prior to a plaintiff claiming "reliance on a material misrepresentation or nondisclosure, he
must fulfill a duty of due care in seeking to ascertain for himself the facts relevant to a
transaction.").  Plaintiff's argument is further undermined by the memorandum from Shareholder
Services, attached as an exhibit to Plaintiff's Response Brief, which indicates that pre-qualified
persons may contact Shareholder Services to inquire as to the outstanding indications of interest.
(Pl.'s Resp. Mot Dismiss, Ex. 4.)  Plaintiff does not suggest that it ever contacted Shareholder
Services to make such an inquiry.

particular facts forming the basis of this belief.[13]  Indeed, despite the stringent pleadings standard of

the PSLRA, at no point does the Second Amended Complaint allege that Benton, either individually

or through Kreszswick, made any misrepresentations to VDM.

In short, the Second Amended Complaint is devoid of any allegation attributing a specific

material misstatement to any Defendant in this case.  Accordingly, the Court must consider whether

there were any material omissions which could satisfy this element.

### b.     The Alleged Omissions

Alternatively, the Second Amended Complaint describes several purportedly fraudulent

omissions of material fact by Benton.  First, Plaintiff alleges that the Info Memo contained three

specific material omissions:  (1) failure to disclose "the existence and content of valuations

performed of the PHLX including, but not limited to, the Kwok Li deal;" (2) failure to disclose

"extant plans to realize the value of the PHLX or assets of the PHLX in separate transactions;" and

(3) failure to disclose "the prior relationships that Robert Gerard, WFG and KBW had had with the

PHLX."  (Sec. Am. Compl. ¶ 44.)  Moreover, Plaintiff asserts that Defendant Benton directly

possessed material information, which she directly and improperly failed to disclose in her

transaction with VDM, including:  (1) the underlying value of the PHLX; and (2) that efforts by the

PHLX were underway to enter into deals with potential investors or partners.  (Id. ¶¶ 50, 55.)

Like the Info Memo misrepresentations, the Info Memo omissions simply cannot be imputed

to Defendant Benton.  Plaintiff has made no specific allegation that Benton had individual

---

[13]  As set forth above, the Court disregards paragraph 55 of the Second Amended Complaint,
which alleges that upon "information and belief," Defendant Benton caused Kreszswick to direct
the offer by VDM to BPII.

responsibility for the decision to exclude this information from the Info Memo. Absent the group pleading doctrine, which has been rejected by the Third Circuit, these omissions are not actionable against Benton. See Winer, 503 F.3d at 337.

With respect to Benton's purported failure to disclose material information regarding the underlying value of the PHLX, the Court likewise does not find any actionable omission. Plaintiff generally argues that Benton failed to disclose the existence and content of other valuations, but identifies only one such valuation – the Kwok Li valuation. (Id. ¶ 44.) As noted above, however, the Kwok Li valuation was performed in October of 2002, more than two years prior to the trade at issue, and well before Benton joined the Board. Plaintiff fails to allege how such a valuation, particularly in the face of subsequent events including demutualization, could even remotely be material two years later. Nor does Plaintiff either include any copy of the Kwok Li valuation to show its basis or scope, or explain how Benton, who was not on the Board in 2002, would have known of its existence. As Plaintiff bears the burden of pleadings such facts with specificity, the Court cannot find that this allegation survives a Rule 12(b)(6) motion.

The final alleged omission – the failure of Benton to disclose PHLX's ongoing negotiations with potential investors – gives this Court significantly more pause. According to the Second Amended Complaint, the PHLX, in November 2004, began serious negotiations with Archipelago Holdings ("Arca"), that led to an offer to purchase the PHLX for $50 million, to be paid through a combination of cash and Arca stock. (Id. ¶ 29(j).) Arca and PHLX entered into a confidentiality agreement on December 3, 2004 to allow the parties to exchange information for purposes of negotiations. (Id.) Although the deal was ultimately never consummated, the negotiations had

potential impact on PHLX stock by reflecting what an outside investor would pay for such stock – a price per share well above what Benton paid in her transaction with Plaintiff. Indeed, as noted in the Second Amended Complaint, the PHLX issued a tender offer, on September 22, 2005, to buy up to 167 blocks of 100 shares at $900 per share from original Class A shareholders, which was the same price the shareholders would have received had the Arca deal closed. (Id. ¶ 29(m).)

Defendants now claim that the Second Amended Complaint "offers no facts to show that PHLX discussions with Arca had advanced to the stage of being material in early December 2004," thereby making any failure to disclose the information non-material. (Defs.' Mem. Supp. Mot. Dismiss 17-18.) Defendants, however, do not dispute that the negotiations were occurring and do not suggest that the talks were at such an embryonic stage as to be irrelevant to an investor. Moreover, according to the Second Amended Complaint, the PHLX-Arca discussions that began in early November 2004 were "serious negotiations" that culminated in a significant offer of cash and Arca stock. (Sec. Am. Compl. ¶ 29(j).) Taking this allegation as true, and given both the dire financial information that PHLX shareholders had received about the state of the PHLX and the fact that shareholders had been informed of PHLX's need for a strategic investor or partner, there remains a "substantial likelihood" that information regarding talks with a potential strategic investor "[c]ould have assumed actual significance" in the deliberations of Plaintiff as a reasonable shareholder. In re Aetna, 34 F. Supp. 2d at 945.[14]

_____

[14] The Court is aware of the prior ruling, in Feinberg v. Benton, No. CIV.A. 05-4847, wherein we found "absolutely insufficient evidence as to any material information regarding those negotiations as of November 30, 2004." (Defs.' Mem. Supp. Mot. Dismiss, Ex. A. N.T. 79:24-80:3.) Aside from the fact that such findings are not binding or dispositive against the Plaintiff in this case, the Court never conclusively determined that the talks were not material. Rather we

In sum, the Second Amended Complaint's multiple allegations of misrepresentations and omissions do not, in large part, satisfy the stringent pleading standard of the PSLRA. Nonetheless, Plaintiff's allegation that Defendant Benton failed to disclose material knowledge of the pending Arca negotiations satisfies the first element of Rule 10b-5. Accordingly, the Court declines to dismiss the claim at this juncture.

### 4. Whether the Second Amended Complaint Has Adequately Pled Scienter

Defendants next challenge the 10b-5 claim on the basis of Plaintiff's alleged failure to plead the second element of a 10b-5 claim – scienter. "Scienter is a mental state embracing intent to deceive, manipulate or defraud." In re Reliance Sec. Litig., 135 F. Supp.2d 480, 506 (D. Del. 2001) (quoting Dirks v. SEC, 463 U.S. 646 (1983)) (further internal quotations omitted). As noted above, under the PSLRA's heightened pleading instructions, a private securities complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

The United States Supreme Court, in Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007), held that this "strong inference" standard raised the bar for pleading scienter. Id. at 321. To further define this standard, the Supreme Court then set forth three guiding criteria, noting that a reviewing court must: (1) accept all factual allegations as true; (2) consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard"; and (3) "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, . . . take into account plausible

_____

found only that there was not enough evidence presented to establish their materiality.

opposing inferences." <u>Id.</u> at 322-23.  Focusing on this last element, the Supreme Court noted that, "Congress did not merely require plaintiffs to provide a factual basis for their scienter allegations." <u>Id.</u> at 323 (internal quotation marks omitted).  Rather, it called for plaintiffs "to plead with particularity facts that give rise to a 'strong' – *i.e.*, a powerful or cogent – inference." <u>Id.</u>  The strength of such an inference cannot be decided in a vacuum, but rather requires a comparison of "[h]ow likely it is that one conclusion, as compared to others, follows from the underlying facts?" <u>Id.</u> at 323-24.   As such, a reviewing court must consider "plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." <u>Id.</u> at 324.  Although the inference of scienter need not be irrefutable, "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." <u>Id.</u>

The Second Amended Complaint sets forth five bases on which it asks the Court to infer Benton's scienter:  (1) her November 2004 letter stating that she had no material information as to the value of PHLX stock; (2) her explanation for not proceeding as required under the PHLX Code of Conduct by contacting the Board and requesting that a committee be formed to pass on her desired stock purchase; (3) her explanation for the reason that the VDM transaction was marked private; (4) her explanation for how she arrived at the price she offered to pay for VDM's stock; and (5) the rapid run-up in the price of PHLX stock at the time relevant to this case, together with Benton's purchase of more than one-half of all the Class A PHLX stock sold before the price per

100 shares rose above the $20,000 per 100 shares mark in December 2004.[15]  (Sec. Am. Compl. ¶¶

59-63.)  Although the Court individually addresses the viability of each allegation, we consider

them collectively in determining whether Plaintiff has pled a strong inference of scienter.

### a.　　The November 2004 Letter

Plaintiff's first basis for scienter states as follows:

> An indicator of Benton's scienter is the letter Benton prepared in the beginning of
> November 2004 stating that Benton had no material information as to the value of
> PHLX stock.  This letter was written far in advance of the Feinberg and VDM
> transactions, which occurred on November 30, 2004 and December 10, 2004
> respectively.  By her own admission, Benton retained this letter for quite some time
> before submitting it so that it was "stale" when submitted and at the time Benton
> submitted a bid on November 17, 2004.  Of course, the previously written letter
> would not preclude the possibility of Benton acquiring non-public, material
> information after writing the letter and before buying the stock in issue which leaves
> as the only conclusion that the letter was meant to be misleading.

(Sec. Am. Compl. ¶ 59.)

This Court finds – and Plaintiff offers – no logical explanation for how this letter creates a

basis for inferring scienter.  The alleged facts merely show that Benton prepared a "no material

information letter" in early November and submitted it on November 17, 2004, around the time that

she put in a bid for PHLX stock.  Nothing in the Second Amended Complaint suggests how the

---

[15]  In its Response to the Motion to Dismiss, Plaintiff raises several other theories or factual bases
for finding scienter, including:  (1) Benton's failure to identify either Robert Kreszswick or Dan
Carrigan as people with knowledge in the Feinberg case; (2) Benton's differing versions of how
BPII became the buyer of VDM's PHLX stock; (3) Benton's differing testimony as to what
happened to 300 of the 600 shares she purchased; and (4) the impermissibility of holding stock in
other than 100 share lots."  (Pl's Resp. Mot. Dismiss 20-27.)  Despite being given multiple
opportunities to plead the complaint, Plaintiff failed to include these theories within the confines
of that document.  As such, Plaintiff may not now raise them in an effort to survive Defendants'
Motion.

passage of approximately two weeks rendered the letter "stale" or evidenced some fraudulent intent.

Moreover, the mere fact that she *could* have acquired non-public, material information after writing

the letter and before buying the stock does give rise to the "strong" inference that she actually did

so.  See Payne v. DeLuca, 433 F. Supp. 2d 547, 572 (W.D. Pa. 2006) ("scienter cannot be shown by

alleging generalized imputations of knowledge based on a defendant's position with the

company.").  Indeed, far from suggesting scienter, the letter actually advocates for a contrary

finding.

### b.    No Board Approval for PHLX Stock Purchase

The Second Amended Complaint next alleges as follows:

> Another indicator is Benton's explanation for not proceeding as required under the
> PHLX Code of Conduct by contacting the Board and requesting a committee be
> formed to pass on Benton's desired stock purchase even though Benton testified in
> Court to her familiarity with the Code of Conduct.  Instead, Benton, who as a PHLX
> Board member certainly had access to the PHLX legal department, has never
> obtained any documentation supporting her story of being approved to buy stock by
> the legal department and cannot even identify who communicated the legal
> department approval to her to proceed on the only two PHLX stock purchases Benton
> made.

(Sec. Am Compl. ¶ 60.)  As discussed in detail above, this allegation focuses on a provision of the

PHLX Code of Conduct originally adopted in 1997 and amended in 2002.  This provision required

that a Board member, prior to purchasing or selling a Seat on the Exchange, notify the Board, which

would then convene a Special Committee to approve or disapprove of the transaction.  (Pl.'s Resp.

Mot. Dismiss, Ex. 1.)

Again, the Court finds that these facts fail to create a strong inference of scienter that is at

least as strong as several compelling, non-inculpatory explanations.  First, as described earlier, the

PHLX, in April 2004, had adopted a new Code of Conduct, which made no reference to an insider's obligation to obtain approval from a Board. (Defs.' Mem. Supp. Mot. Dismiss 20, Ex. B, § III.3.) Although Plaintiff argues that this Code of Conduct never took effect since it never received SEC approval, Plaintiff cites to no authority that, to date, has affirmatively deemed this Code of Conduct invalid. Therefore, the logical inference – and one that is far more plausible than an inference of scienter – is that Defendant Benton reasonably believed this new Code of Conduct to be controlling and, thus, fully complied with its provisions.

Second, even if the new Code of Conduct was not actually valid and even if Benton should have known of its invalidity, she certainly could have reasonably believed that the previous "Seat Transaction Policy" was rendered obsolete by the demutualization of the PHLX and the elimination of all seats on the Exchange. Although the 2004 amendment to PHLX Rule 708 deleted the reference to "seats" in the 1997 Code of Conduct, this amendment did not suggest that the previous "Seat Transaction Policy" was then converted into a "Share Transaction Policy" that governed all future trades of PHLX stock.[16]

Finally, assuming *arguendo* (a) that the 2004 Code of Conduct was not effective; (b) that Benton should have known of its invalidity; and (c) that the previously-implemented Seat

---

[16] Plaintiff notes that, in an Executive Committee Meeting of August 1, 2005, the Board "authorized the establishment and appointment of a Special Committee on PHLX Share Transactions consisting of Albert Dandridge, Peter Erichsen and William Stallkamp." (Pl's Resp. Mot. Dismiss, Ex. 9.) It goes on to argue "[t]hat this reestablishment of a PHLX Board committee did not require noticing in the Federal Register demonstrates that this procedure or requirement was in effect at all times relevant thereto." (Id. at 3.)

The Court declines to make the same assumption. The memorandum cited by Plaintiff merely says that the Board is establishing, not re-establishing, a Special Committee on PHLX Share Transactions. Moreover, Plaintiff fails to cite any applicable regulation showing that the establishment of such a committee would require noticing in the Federal Register.

Transaction Policy applied to future share transactions by insiders, Plaintiff has not clearly alleged that Defendant Benton violated the Policy. As set forth above, the Policy stated that before a Covered Person or their associated member organization could purchase or sell a Seat, "the Covered Person must notify the Exchange, in writing, which will convene the Special Committee on Governor and Committee Member Seat Transactions ('Special Committee')." (Pl.'s Resp. Mot. Dismiss, Ex. 1.) According to this plain language, once the "covered person" notified the Board of the transaction, his or her obligations were fulfilled and the onus shifted to the Board to convene the Special Committee. As set forth above, the Second Amended Complaint concedes that Benton submitted to the Board a letter prepared in early November 2004, indicating her intention to buy PHLX stock and proclaiming that she had no material inside information. (Sec. Am. Compl. ¶ 59.) Further, in a letter dated December 10, 2004, from Benton to Murray Ross of the PHLX, Benton stated:

> Confirming my letter of November 3, 2004, I am buying 600 additional shares in PHLX stock on this date from Van der Moolen U.S.A. LLC, after solicitation by and negotiation with that company's representative Janet R. Bennett. I do not believe that I am aware of privileged or confidential information that would affect the investment value of the PHLX stock. I have made full disclosure of my Board position to the seller. I understand that there is no longer a Special Committee to review such transactions so I request that this letter be forwarded to the appropriate authority or record keeper. Thank you.

(Defs.' Mem. Supp. Mot. Dismiss, Ex. C.) [17] The Board's subsequent failure to convene a Special Committee in response to either letter, or otherwise bar the covered transaction does not render

---

[17] Notably, this letter was not referenced in the Complaint. Although Plaintiff does not dispute its authenticity, the Court remains wary that we are proceeding at the Rule 12(b)(6) stage and may not consider matters outside the pleadings. As such, we emphasize that this letter is not dispositive of our decision.

Benton's actions violative of the cited Policy.

In sum, Defendant Benton's failure to obtain approval from the PHLX Board before engaging in the December 10, 2004 stock transaction at issue is subject to numerous explanations that are far more compelling than an inference of scienter evidencing her intent to trade on material, inside information. In other words, although an inference of scienter is permissible from these facts, it is not cogent in light of the other possible explanations.[18] Telllabs, 551 U.S. at 324; see also In re Radian Sec. Litig., 612 F. Supp. 2d 594, 608 (E.D. Pa. 2009) (noting that "a plaintiff's inference that a defendant's alleged actions are reckless or intentional must be compared to any nonculpable inference offered by the defendant, and must be cogent and at least as compelling as any such nonculpable inference in order for the complaint to give rise to a strong inference of scienter.").

### c. Explanation for the Reason the Trade Was Marked Private

Plaintiff's third basis for a finding of scienter alleges as follows:

> Benton's explanation for the reason that the VDM trade was marked private, as testified to before this Court, has proved to be knowingly false as Benton knew that VDM left the PHLX floors in December 2003 since Benton entered into negotiations to buy their operation from VDM at that time. But Feinberg, who was on the equity floor, was unfamiliar with the VDM operations on the options floor and that is why Benton could use that explanation in the Feinberg case. In any event, VDM denies having made any request that VDM sale to BPII be marked private and also represents that VDM had no reason to have that transaction marked private.

_____

[18] The parties engage in some discussion regarding Benton's testimony in the Feinberg trial that she sought an obtained clearance from the PHLX legal department regarding her interest in buying PHLX stock. Defendants argue that her seeking pre-trade legal advice evidences her interest in avoiding wrongdoing and supports an inference of no scienter. (Defs.' Mem. Supp. Mot. Dismiss 21.) Plaintiff, on the other hand, contends that Benton has never produced any documentation supporting her story and has never identified who communicated the legal department approval to her regarding the stock purchases. (Sec. Am. Compl. ¶ 60.) As resolution of this dispute would require factual findings by the Court, or at least consideration of evidence outside the pleadings, it is inappropriate on a Rule 12(b)(6) motion.

(Sec. Am. Compl. ¶ 61.)  As explained by Plaintiff's subsequent briefing, the December 10, 2004

transaction between BPII and VDM was marked private.  Plaintiff speculates that it was Benton

who wanted the trade marked private to avoid anyone approaching VDM after the sale to inquire as

to "why it sold its stock at a discounted price."  (Pl.'s Resp. Mot Dismiss 27.)  Alternatively,

Plaintiff theorizes that had the trade been open, "the bidders who had been bypassed might have

complained as to the priority of price violation."  (Id.)

Again, such supposition fails to meet the <u>Tellabs</u> standard for specifically alleging scienter.

First, despite the stringent pleading standards of the PSLRA, however, and despite the fact that the

current Second Amended Complaint marks the third iteration of that document, Plaintiff fails to

ever quote Ms. Benton's allegedly false testimony addressing the marking of the trade private.  As

such, the Court is left to wonder as to the precise nature of this testimony, how it was false, and how

such falsity establishes scienter.[19]

---

[19]    Indeed, the sole testimony cited by Plaintiff – albeit for another purpose – that remotely
touches on the issue of privacy appears on page twenty-four of its Response, as follows:

> I [Benton] asked [Bennett] for a price.  She didn't know a price, she had not come
> up with a price yet.  So I went back to Mr. Kreszswick and got the prices that were
> all the bids on the book.  That is the people who were bidding, for how much
> stock and what prices at the time.  And found out that about the average price was
> around $12,500.  But there weren't enough bids at the Exchange to even sell 600
> shares.  So, the next thing I did was try to think of one or two people *who I*
> *thought I could tell in confidence of Van Der Moolen's plan and their desire to*
> *sell their stock without exposing Van Der Moolen to any, to anyone finding out*
> *about it, especially their employees right at the Stock Exchange.*  And I
> approached one man, Dan Carrigan.

(Pl.'s Resp. Mot Dismiss 24 (quoting N.T., <u>Feinberg v. Benton</u>, Civ. A. No. 05-4847, 153, Mar.
3, 2008).)  Plaintiff fails to explain how this testimony was knowingly false.  Certainly, in light
of Benton's awareness that VDM had already concluded its operations on the PHLX floor and
was eventually ceasing its North American operations, her discretion in not openly discussing the

Second, Plaintiff fails to directly allege, at any point, that it was Benton who marked the trade private. Rather, Plaintiff surmises that because it was not VDM who had the trade marked private, it must have been Benton who did so. Such allegations, aside from being speculative, fail to consider the alternative possibility that the Exchange itself marked the trade private.

Third, even making the rather broad leap to assume that Benton had the trade marked private, Plaintiff neglects to explain how action this establishes her scienter prior to the transaction. As evidenced by Plaintiff's own brief, the trade of 600 shares was fully disclosed on the records of the PHLX, together with the identities of Plaintiff as the seller and BPII as the buyer. (Pl.'s Resp. Mot. Dismiss, Ex. 8.) The sole element omitted was the price of the trade. The mere marking of the trade private, however, did not restrict either VDM or Benton discussing the sale price with other investors. Accordingly, the Court again questions how such actions could establish Benton's intent to knowingly trade on material inside information.

In short, where a plaintiff chooses to assert circumstantial evidence of intent or recklessness – as Plaintiff does with this allegation – "the strength of the circumstantial allegations must be [even] greater." Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (quotations omitted). In such a situation, "the plaintiffs must support their allegations by detailing with particularity, 'the who, what, when, where and how' of the events at issue and present clear facts verifying plaintiff's deductions with respect to defendant's state of mind." In re Intelligroup Sec. Litig., 527 F. Supp. 2d 262, 285 (D.N.J. 2007). In this case, Plaintiff asks this Court to infer Benton's state of mind from circumstantial evidence, but fails to detail any information about such evidence. Thus, the Court

_____

trade suggests not scienter, but rather consideration for VDM's own issues of confidentiality.

declines to infer scienter from this assertion.

          **d.**      **Explanation of How Benton Arrived at the Price Offered for VDM Stock**

In its fourth effort to plead scienter, Plaintiff alleges:

> Upon information and belief, as set forth in the preceding as to the then pending bids for PHLX stock, or if this time Shareholder Services will be compelled to produce its records as to bids made for PHLX stock at the relevant times, Benton's explanation for how Benton arrived at the price Benton offered to pay to buy VDM's stock will be shown to be knowingly false as taking an average of bids of at least $16,000 and up to $20,000 just will not yield an average of $12,5000. The Shareholder Services' records will also show that there was no reason other than favoritism for diverting the VDM offer to sell to Benton as Benton, assuming arguendo Benton even had a bid pending, was not the highest bidder. The basis for the assertion is that it is doubtful that Benton even had a bid pending at the time VDM offered its stock for sale is that Shareholder Services is a division of a stock exchange. When bids or offers are made at an exchange, the date and time at which such are made must be noted because the first in time of bids or offers of the same amount get filled first. Benton only had one bid for 100 shares of PHLX stock and that got filled with the purchase from Feinberg. Bids do not get "continued" after being filled; the bid terminates. A new bid must be reentered and when reentered the date and time noted, which did not occur here.

(Sec. Am. Compl. ¶ 62.)

As set forth above, the Court declines to consider this paragraph as it is alleged only "on information and belief" and fails to plead with the particularity required by the PSLRA. See infra 30-31. In turn, it cannot create a basis for inferring scienter.

Even were the Court to factor this allegation into the scienter analysis, it nonetheless fails to make a strong showing required by the PSLRA. First, contrary to the specific pleading requirements, the Second Amended Complaint never quotes Benton's explanation for how she arrived at the price she offered to pay to buy VDM's stock. Rather, it just blanketly alleges that it

"will be shown to be knowingly false" since the average of the then-pending bids did not yield an average of $13,000 per 100 shares – the price that was ultimately paid by BPII for VDM's PHLX stock.  Absent a recitation or more specific description of Benton's testimony, such an allegation does not comply with the applicable pleading standards.

Second, to the extent the Court steps outside the pleadings and considers Benton's testimony as cited in Plaintiff's Response to the Motion to Dismiss, we remain unconvinced.  According to Plaintiff's Brief (which still fails to attach a copy of any of Plaintiff's testimony or to even cite the appropriate pages), Plaintiff testified, at her September 26, 2006 deposition, that:

> After I got the prices from Bob Creswick for what all of the bids were at that time, including my bid for $15,000, which still remained in there, I presented them to the Van der Moolen representative and we came up with a price.  She said she would be willing to sell the 600 shares at $13,000. . . . we would be willing, I had a group of people, because the group consisted of my limited partners, myself, and Mr. Ross, to buy the 600 shares.

(Pl.'s Resp. Mot. Dismiss 24 (citing Benton Deposition, Sep. 26, 2006.)  In her March 3, 2008 testimony at the Feinberg trial, Benton testified that,

> I asked for a price.  She didn't know a price, she had not come up with a price yet.  So I went back to Mr. Kreszswick and got the prices that were all the bids on the book.  That is the people who were bidding, for how much stock and what prices at the time.  And found out that about the average price was around $12,500.  But there weren't enough bids at the Exchange to even sell 600 shares.  So, the next thing I did was try to think of one or two people who I thought I could tell in confidence of Van Der Moolen's plan and their desire to sell their stock without exposing Van Der Moolen to any, to anyone finding out about it, especially their employees right at the Stock Exchange.  And I approached one man, Dan Carrigan.

(Id. (quoting N.T. Benton, Feinberg v. Benton, 153, Mar. 3, 2008).)

Notwithstanding any minor and relatively non-material discrepancies between the two

statements from Benton, given a year and half apart, the Court can discern no basis for an inference of scienter. Although there is a possibility that Benton's discrepancies were a result of false testimony designed to cover up her attempts to "lowball" VDM, such an inference is far from cogent and compelling and is not as strong as other "plausible nonculpable explanations for the defendant's conduct." Indeed, the testimony, for the most part, is similar – in attempting to arrive at a price for the 600 shares of stock, Benton considered the other bids then pending and, jointly with VDM's representative, arrived at a mutually agreeable price of $13,000 per 100 shares.[20] In the process, she considered bringing in other investors, but ultimately opted to purchase all 600 shares herself. Nothing in the quoted testimony suggests anything more sinister. Nor do the minor discrepancies indicate more than normal memory lapses.[21]

Third, at some point, VDM and BPII, both sophisticated investors, bargained for and reached an agreement on price. VDM certainly had access to bid information and was in free position to negotiate with Benton as to the sale price. (Pl.'s Resp. Mot. Dismiss, Ex. 2 (Memorandum from Shareholder Services noting that pre-qualified persons who wish to inquire as to what the presently

---

[20]  Plaintiff's exhibits reveals that, from July to early December 2004 (prior to the transaction at issue), there were several bids for 100 shares of PHLX stock, ranging from $10,000 per 100 shares to $18,750 per 100 shares. (Pl.'s Resp. Mot. Dismiss, Ex. 8.) Specifically, the following bids had been made, each for 100 shares: $12,000 on July 21, 2004; $14,500 on November 12, 2004; $10,000 on November 12, 2004; $15,000 on November 17, 2004; $16,600 on November 23, 2004; $18,750 on November 30, 2004; and $17,000 on November 30, 2004. (Id.) The average of such bids was approximately $14,800.

[21]  Plaintiff argues that "Benton's credibility is sorely tested" by the discrepancies in her testimony and that Benton was fully prepared by her attorneys, making any claimed "memory lapses" unbelievable. (Pl.'s Resp. Mot. Dismiss 21, 25.) Aside from the fact that the Court is precluded from making any finding as to her credibility at this time, the discrepancies in her testimony were so minute that this Court would have trouble using them to discredit her.

outstanding Indications of Interest are may contact Shareholder Services).)  Had Benton grossly

misrepresented the average bid, VDM could have exercised some reasonable diligence to discover

that information and either cancel or re-negotiate the trade.  See Matthews v. Kidder, Peabody &

Co., No. CIV.A.99-85, 2000 WL 33726916, at *24-25 (W.D. Pa. Aug. 18, 2000) (noting that

"reasonable investors are expected to rely on the *mix* of information provided to them," and have a

duty to exercise reasonable diligence to determine the suitability of an investment).  The fact that it

chose not to do so suggests VDM's belief that the agreed-upon price accurately reflected the price

for a bulk sale of 600 shares of PHLX stock.

Finally, the Court finds no merit to Plaintiff's unsupported theory that through Benton's

position on the PHLX Board, she was able to direct Shareholder Services to divert the VDM offer to

herself, despite the fact that "it is doubtful" that she even had a bid pending.  As Plaintiff's own

documents reflect, no single bid sought more than 100 shares of PHLX stock and there were none

that would absorb all of VDM's shares.  Plaintiff cites to no PHLX rule that precluded Shareholder

Services, aware of Benton's potential interest in such shares, from directing the offer to her.[22]  Nor

has Plaintiff alleged any facts to establish that she was able to exercise any special control over

Shareholder Services merely by virtue of her position on the Board.  The Third Circuit has held that

any generalized inference that a defendant must be aware of certain information based solely on his

or her position within an organization falls short of the PSLRA's heightened pleading standard for

---

[22]  The mere fact that Benton may not have had a bid pending at that time is of no moment.
Plaintiff's Exhibit 2, which is a memorandum from Shareholder Services to holder of Class A
stock expressly states that holders of Class A common stock and other qualified persons seeking
to purchase or sell Common Stock "need not communicate indications of trading interest . . . in
relation to the Common Stock to or through the Exchange."  (Pl.'s Resp. Mot. Dismiss, Ex. 2.)

state of mind.  See In re Rockefeller, 311 F.3d at 224 (holding that securities fraud plaintiffs "may not benefit from inferences flowing from vague or unspecific allegations – inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis"); In re Adolor Corp. Sec. Litig., 616 F. Supp. 2d 551, 573-74 (E.D. Pa. 2009) (rejecting plaintiffs' claim that defendants must have learned of certain information from their scientists and researchers because of defendants' positions as directors within the company).  Therefore, this allegation of scienter likewise fails.

### e. Rapid Run-Up in Bid Prices for PHLX Stock

Plaintiff's final allegation of scienter states:

> As seen in the preceding, where it was noted that even early bidders for PHLX stock that did not purchase any stock were rapidly increasing their bids without any news to be causing such a run-up in the price of PHLX stock, there was a rapid run–up in the price of PHLX stock at the times relevant hereto that continued through to the Tender Offer made by the PHLX to buyback and retire its Class A stock.  Unusual behavior in the price of a stock is often an indicator that non-public, material information is available to certain persons then trading in the stock.  In the case of Benton, Benton was able to purchase more than one-half of all the Class A PHLX stock sold before the price per 100 shares left behind the $20,000 per 100 shares mark in December 2004.

(Sec. Am. Compl. ¶ 63.)  In connection with this argument, the Second Amended Complaint goes on to argue that the scienter was evident in:

> the use of Demutualization to unlock the value of the PHLX followed by a purported attempt to reach a deal with Archipelago, solely to set a lowball price at which the stock of the non in crowd could be valued for a sale of control to "friends" of PHLX senior management who would then all be handsomely rewarded after the PHLX did a "pump and dump" stock initial public offering which was estimated to yield a market capitalization of between $800 million and $1.3 million.
> . . . .
>
> Plaintiff does not allege that Benton was central to the plan to convert the value of the PHLX to their own benefit at the expense of the former PHLX seat owners.  But

Benton, having served on the Demutualization Advisory Group and then serving on the Executive committee was in a position to know what was occurring as well as the goals. From the information generated by the PHLX financial advisor Keefe, Bruyette & Woods, that Benton had access to as a member of the Demutualization Advisory Group, and, in fact, it was Benton's duty to review such, Benton knew of the value contained in the PHLX and from the Executive Committee knew when steps began to realize that value as is shown by Benton's stock purchases that coincidentally occur just before a freeze on stock purchases by Board members.
. . . .

VDM, unlike Benton, was proceeding under the belief that PHLX was failing, as the Board and PHLX senior management had given public warnings of the second half of 2004 and that BPII was the only bidder for its stock.

(Id. ¶¶ 69-71.)

Unlike Plaintiff's previous allegations of scienter, this argument raises significantly more red flags. Although the mere fact of insider stock sales are not alone indicative of scienter, "insider stock sales that are unusual or suspicious in timing or amount may create an inference of scienter." In re Am. Bus. Fin. Servs., Inc. Sec. Litig., 413 F. Supp. 2d 378, 401 (E.D. Pa. 2005) (citations omitted). Insider sales may be deemed unusual based on a variety of factors including "the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved." In re Suprema, 438 F.3d at 277; In re Astea Int'l Inc. Sec. Litig., No. CIV.A.06-1467, 2007 WL 2306586, at *13 (E.D. Pa. Aug. 9, 2007). In addition, a court may consider whether the sales were "normal and routine" and "whether the trader received substantial profits in comparison to the trader's compensation." Astea, 2007 WL 2306586, at *13 (citing In re Burlington, 114 F.3d at 1423). Notably, large dollar amounts of gross proceeds, standing alone, typically do not suffice to establish motive. Id. at *13. Moreover, "a broad temporal distance" between stock sales and a disclosure of bad news, or alternatively between stock purchases and a

disclosure of good news, may defeat an inference of scienter.  Id. at *15  (lapse of five months too attenuated to infer scienter); In re Party City, 147 F. Supp. 2d at 313 (lapses of three, four, and twelve months too attenuated to draw an inference of scienter).  Multiple courts, however, have found that "stock-based acquisitions at the time of the alleged misrepresentations support a strong inference of scienter." In re ATI Techs, Inc. Sec. Litig., 216 F. Supp. 2d 418, 440 (E.D. Pa. 2002) (citing cases).

Plaintiff's final allegation, considered in the totality of the circumstances in this case, creates a strong inference that Defendant Benton possessed a mental state embracing an intent to deceive, manipulate, or defraud at the time of the alleged omissions.  As repeatedly noted, Benton was a member of the PHLX Board, as well as its Executive Committee.  (Sec. Am. Compl. ¶ 40.) Following demutualization in January 2004, each seat owner was given 100 shares of Class A common stock per seat.  (Id. ¶ 16.)  From late 2003 through November of 2004, seat – and subsequently stock – owners were repeatedly told of the PHLX's dire financial condition, its potential bankruptcy, and its need to find a strategic investor or partner.  (Id. ¶ 37.)  Throughout this time, Benton purchased no additional stock.

In November of 2004, the PHLX began serious negotiations with Arca, the materiality of which remains an issue of fact.  (Id. ¶ 29(j).)  Shortly thereafter, in mid-November 2004, Benton put in her first indication to buy 100 shares of PHLX stock, and she purchased such shares from Richard Feinberg on November 29, 2004 for a total price of $20,000.  (Id. ¶ 50.)  At the beginning of December 2004, Benton entered and completed negotiations with Plaintiff to buy 600 shares of PHLX stock at a price of $13,000 per 100 shares.  (Id. ¶ 12.)  Five days after the December 10, 2004

trade between BPII and VDM, the PHLX Board imposed a "freeze" on PHLX stock transactions by PHLX Board members. (Id. ¶ 51.) Benton's purchases up until that day constituted approximately one half of all PHLX stock that was sold since the day of demutualization. (Id.)

In early January of 2005, bidding for PHLX stock began to substantially increase, with the low mark being above $20,000 per 100 shares. Actual sales of PHLX stock were at minimum $30,000 per 100 shares. That run-up in price continued on a steady upward slant in light of the multitude of talks by PHLX with potential investors/strategic partners, including Arca, who offered $50 million in 2005 to acquire all PHLX stock.

Considered in conjunction, these facts give rise to a strong inference of scienter. Benton held a position on the PHLX Board and Executive Committee, giving her access to a wealth of information about the PHLX's financial status and its efforts to find a financial partner. While that fact, standing alone, does not establish scienter, it is an important piece of a larger puzzle. Despite demutualization occurring in January, Benton made no indications of intent to buy PHLX stock and consummated no trades until the very end of November 2004, after the commencement of the Arca negotiations. At that strategically-suspicious point, and with no other clear motivating factor for her trades, she purchased a substantial amount of PHLX stock – 700 shares – in a two-week period. The December 15, 2004 "freeze" on Board trading of PHLX stock suggested that information was available to Board members that would taint the legality of their trades. The subsequent and substantial increase in bid prices, particularly in light of the fact that the Board had previously been touting the financial difficulties of the Exchange without revealing talks with potential investors, further intimates the existence of some material, non-public information. Finally, the size of

Benton's profits that she made from this fortuitous transaction is substantial and telling – she sold *each* of her 100 share blocks for $90,000, having paid only $13,000 apiece.

In an effort to defeat this inference, Defendants offer several unconvincing arguments. First and foremost, they contend that the Second Amended Complaint does not allege facts to show that Benton was aware of material PHLX/Arca discussion before BPII purchased VDM's shares. In support of their position, Defendants cite to this Court's previous finding of fact in the case of Feinberg v. Benton. In that matter, the plaintiff also alleged insider trading against Defendant Benton based on her knowledge of the Arca negotiations. At the close of trial, this Court made clear factual findings that Benton "wasn't aware of any information in that regard until the board meeting of December 15th 2004" and that Benton's testimony was credible. (Defs.' Mem. Supp. Mot. Dismiss, Ex. A., N.T. 80:1-20, Mar. 4, 2008.) Defendants now contend that "[t]hese findings provide powerful support for the conclusion that . . . Ms. Benton did not learn about those discussions [with Arca] until December 15, almost a week after the VDM sale was completed." (Defs.' Mem. Supp. Mot. Dismiss 18.)

While such findings are certainly probative, they are not legally dispositive of the issue at hand. First, collateral estoppel is inapplicable in this case because Plaintiff, who would be the party being precluded from relitigating this issue, was not fully represented in the Feinberg action. See Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc., 458 F.3d 244, 249 (3d Cir. 2006) (noting that one of the four elements of collateral estoppel is that the party being precluded from relitigating the issue was fully represented in the prior action), cert. denied, 127 S. Ct. 1878 (2007). As such, the Court cannot simply rely on such prior findings to foreclose Plaintiff from presenting its own proof

as to Benton's knowledge of the Arca negotiations.[23]  Although this Court may properly take judicial notice of this proceeding of public record, the basic principle remains that, as with any motion to dismiss, the Court must accept all factual allegations in the complaint as true.  Telllabs, Inc., 551 U.S. at 322.  Further, while a court may not infer that a defendant was aware of information merely by virtue of his or her position within a company, where the information relates to the organization's core business, such facts are powerful circumstantial evidence of scienter.  In re Aetna Sec. Litig., 34 F. Supp. 2d at 953 (E.D. Pa. 1999).  Undoubtedly, the commencement of negotiations regarding a transaction that could provide a significant influx of capital into a near-bankrupt Exchange falls within the core of PHLX's business and was knowable to a person sitting on the PHLX's Executive Committee.

Second, Defendants contend that the subsequent increase in PHLX stock price "could be attributable to many factors having nothing to do with inside information."  (Defs.' Mem. Supp. Mot. Dismiss 24.)  Defendants point to the scarcity of stock being offered as pushing up the offer price, but fail to indicate why such scarcity did not affect the price in October or November of 2004.  Further, Defendants reference the August and September 2005 offers as positively influencing the price shares, but they neglect to explain how such events caused the run-ups in early January 2005.

Finally, Defendants take issue with Plaintiff's reference to the fact that Benton purchased more than one-half of the PHLX shares that traded from demutualization in January 2004 to the "freeze" on December 15, 2004.  They reason that it is "not surprising" that relatively few shares

---

[23]  As noted by Plaintiff, Feinberg was precluded by the Court from obtaining certain records prior to August or September of 2004.  Conceivably, Plaintiff may be entitled to such discovery in this case.

changed hands since demutualization had just occurred in January 2004.  What Defendants fail to

note, however, is that there were, in fact, multiple trades of shares following demutualization – all in

increments of 100 shares.  Benton, however, waited approximately eleven months following

demutualization – right after the start of Arca negotiations – to suddenly purchase 700 shares of

PHLX stock.

In light of the foregoing, the Court is compelled to find that Plaintiff's final allegation raises

a cogent inference of scienter that is at least as strong – if not stronger – than any opposing, non-

inculpatory inference.  In turn, we cannot grant the Motion to Dismiss the Rule 10b-5 claim on this

ground.

### 5.  Whether the Second Amended Complaint Has Adequately Pled Reliance

Defendants next attack the Rule 10b-5 claim for failure to specifically plead Plaintiff's

reliance upon the omissions at issue.  They claim that the Second Amended Complaint neglects to

allege that VDM ever read or even received the 2003 Info Memo or that Benton made any direct

misrepresentations to VDM's representative prior to VDM's decision to sell its shares.  The Court

finds no merit to Defendants' argument.

As noted above, in order to state a claim under rule 10b-5, a plaintiff must allege reliance on

a defendant's material misrepresentations or omissions.  Dura Pharm., 544 U.S. at 341-42.  The

Third Circuit has explained:

> [i]n order to satisfy the causation element of an action under § 10(b) or Rule 10b-5,
> plaintiffs who purchase in an open and developed market need not prove direct
> reliance on a defendant's misrepresentations; rather, they can satisfy their burden of
> proof simply by showing that the defendant made a material misrepresentation.

In re Phillips Petroleum Sec. Litig., 881 F.2d 1236, 1249 (3d Cir. 1989) (citing Basic v. Levinson, 485 U.S. 224 (1988)). With respect to an omission, "[r]eliance by an investor to whom a duty of disclosure is owed is presumed in cases in which there is an omission of material fact by one with a duty to disclose." Lautenberg Found. v. Madoff, No. CIV.A.09-816, 2009 WL 2928913, at *11 (D.N.J. Sep. 9, 2009) (citing Stoneridge, 552 U.S. at 158-59). Notably, the heightened pleading requirements of both Fed. R. Civ. P. 9 and the PSLRA are inapplicable to the reliance prong of a Rule 10b-5 claim. Dura Pharm., 544 U.S. at 346. Accordingly, this element is subject to only the ordinary notice-pleading standards of Rule 8. Id.

This Court finds that Plaintiff has adequately pled reliance. As to the Info Memo, reliance is a non-issue since the Court has declined to find that any material misstatements or omissions contained therein could be imputed to Defendant Benton. As to Benton's direct communications, however, Plaintiff has adequately pled that Benton, as an insider, possessed material inside information as to the value of PHLX stock and that she failed to disclose that information to VDM, who was proceeding under the belief that the PHLX was failing. Plaintiff goes on to allege that had Benton disclosed such information, VDM would not have sold its PHLX stock at such a depressed price. Such allegations are sufficient at this stage of the litigation.

### 6. Whether the Second Amended Complaint Has Adequately Pled Both Economic Loss and Loss Causation

Finally, Defendants challenge the last two elements of a 10b-5 claim: economic loss and loss causation. "[L]oss causation inquiry asks whether the misrepresentation or omission proximately caused the economic loss." McCabe v. Ernst & Young, LLP, 494 F.3d 418, 426 (3d Cir. 2007). As

to economic loss, the analysis requires the plaintiff to establish "a decline in the security's price, thus creating an actual economic loss for the plaintiff." Id. at 425-26.

Although the Third Circuit, in McCabe, demanded significant proof of loss causation and economic loss to survive a motion for summary judgment, it conceded that a different approach is necessitated at the motion to dismiss level. Id. at 427 n.4. The Court ruled that loss causation "becomes most critical at the proof stage," id. n.4 (quoting EP MedSystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 884 (3d Cir. 2000), and recognized that "[l]oss causation issues can be highly factual, thus frequently precluding judgment on the pleadings."[24] Id. (quoting 3 THOMAS LEE HAZEN, SECURITIES REGULATION § 12.11[3] (6th ed. 2009)). Moreover, as with the reliance element, economic loss and loss causation are subject only to the notice pleadings standards of Rule 8. Dura Pharm., 544 U.S. at 346.

In this case, the Second Amended Complaint alleges that "[i]f Plaintiff had either known that there were other bidders for PHLX stock at the time or possessed the same knowledge that Benton did as to the market for PHLX stock, Plaintiff would not have sold the 600 shares of PHLX stock to anyone for $13,000 per 100 shares." (Sec. Am. Compl. ¶ 65.) Furthermore, it claims that "[t]he value of Class A PHLX stock did not suddenly increase in value as of April 20, 2005 but had been there when Benton bought the VDM stock" and that Benton was part of a group of insiders that:

---

[24] Indeed, in its prior case of EP MedSystems – a case affirmatively cited in McCabe – the Third Circuit recognized that "[a]lthough . . . the allegation that [plaintiff] 'sustained financial loss as a direct result of the aforementioned misrepresentations and omission on the part of [defendant]' could have more specifically connected the misrepresentation to the alleged loss . . . when we draw all inferences in plaintiff's favor, we conclude that [plaintiff] has adequately alleged loss causation." EP MedSystems, 235 F.3d at 885.

[used demutualization] to unlock the value of the PHLX followed by a purported attempt to reach a deal with Archipelago, solely to set a lowball price at which the stock of the non in crowd could be valued for a sale of control to 'friends' of PHLX senior management who would then all be handsomely rewarded after the PHLX did a 'pump and dump' stock initial public offering which was estimated to yield a market capitalization of between $800 million and $1.3 billion.

(Id. ¶ 68-69.)  The reasonable inference from these allegations is that had Benton not made the

material omission of information, Plaintiff would have either not sold its stock to BPII for only

$13,000 – which was the lowest price ever paid for PHLX stock – or would have simply chosen to

hold on to the stock until it could have obtained a higher value.  Such allegations satisfy Rule 8's

requirement of a "short and plain statement" that provides fair notice to Defendants of the basis for

both loss causation and economic loss.  Accordingly, the Court declines to dismiss on this ground.

### 7.  Conclusion as to the Rule 10b-5 Claim

The Court thus finds that Plaintiff's section 10(b) and Rule 10b-5 claims survive – albeit

quite narrowly – the Rule 12(b)(6) Motion to Dismiss.  Plaintiff has alleged a single cognizable

material omission in Defendant's failure to disclose information about the Arca negotiations.

Moreover, despite the insufficiency of most of its supporting allegations, Plaintiff has managed to

properly plead scienter by establishing the fortuitous and unusual timing of Benton's trades, together

with her position on the Board and her substantial profit-realization from the trades.  Finally,

Plaintiff satisfies its pleading burden on the elements of reliance, loss causation, and economic loss.

Therefore, the Court denies the Motion to Dismiss the Rule 10b-5 claim.

### C.  Control Person Liability Claim

Defendants further move to dismiss Plaintiff's claim under section 20(a) of the Securities

Exchange Act, which provides that:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t.  Defendants' argument, however, is premised entirely on the principle that "[c]laims under Section 20(a) are derivative," and "must be dismissed if the underlying Section 10(b) claim is dismissed."  (Defs.' Mem. Supp. Mot. Summ. J. 30 (quoting In re Loewen Group Inc. Sec. Litig., No. CIV.A.98-6740, 2004 WL 1853137, at *5 (E.D. Pa. Aug. 18, 2004).)  As set forth in detail above, however, the Court is not dismissing the Rule 10b-5 claim.  Accordingly, no basis exists for dismissal of the coordinate section 20(a) claim.

### D.  Claims Under the Pennsylvania Securities Act

In Count III of the Second Amended Complaint, Plaintiff raises, for the first time, a violation of the Pennsylvania Securities Act of 1972, which states, in pertinent part:

> Any person who purchases a security in violation of sections 401, 403, 404 or otherwise by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, shall be liable to the person selling the security to him, who may sue either at law or in equity to recover the security, plus any income or distributions, in cash or in kind, received by the purchaser thereon, upon tender of the consideration received, or for damages if the purchaser no longer owns the security.

70 Pa. Cons. Stat. § 1-501(b) (2004).  Defendants contend that this claim must be dismissed on three grounds:  (1) Plaintiff did not seek or obtain Court permission to add this as a new claim in the

Second Amended Complaint; (2) Plaintiff has failed to plead this claim with sufficient particularity; and (3) the claim is barred by the applicable statute of limitations.

While the Court agrees that the claim must be dismissed, we do so without prejudice. Under Federal Rule of Civil Procedure 15(a)(2), after a responsive pleading is filed, "a party may amend its pleading only with the opposing party's written consent or the court's leave." FED. R. CIV. P. 15(a)(2). Where new claims are added without either the opposing party's consent or leave of court, the claims must be dismissed without prejudice to the plaintiff's moving for leave to amend. Campbell v. Potter, No. CIV.A.01-4517, 2005 WL 2660380, at *2 (E.D. Pa. Oct. 17, 2005).

In this case, Mill Bridge LLC filed the original Complaint against Defendants on June 16, 2008, alleging only a Rule 10b-5 claim, section 20(a) control person liability, and rescission under section 29(b). In response to Defendants' original motion to dismiss, Mill Bridge LLC requested, and the Court granted, additional time to research issues regarding the proper plaintiff. On October 20, 2008, the current Plaintiff, Mill Bridge V, Inc., filed a First Amended Complaint raising the identical claims. Again Defendants moved to dismiss, and the Court granted the motion without prejudice, ordering Plaintiff to re-amend the complaint to correct certain pleading defects. Finally, on May 20, 2009, Plaintiff filed its Second Amended Complaint adding, for the first time, the Pennsylvania Securities Act claim, as well as two new Defendants.

Absent leave of Court, such a unilateral addition of a new claim is simply not permitted by the Federal Rules of Civil Procedure. The April 30, 2009 Order dismissing the First Amended Complaint without prejudice only granted leave for Plaintiff to correct deficiencies in its Rule 10b-5 claim and its section 29(b) claim. Nothing in that Order allowed for the addition of any new claims.

Accordingly, the Court dismisses this Count without prejudice to Plaintiff's appropriate request for leave to add this claim.[25]

## IV.    CONCLUSION

For all of the reasons set forth above, the Court will dismiss with prejudice Plaintiff's cause of action under section 29(b) of the Securities Exchange Act and, without prejudice, its state law claim under the Pennsylvania Securities Act, but will maintain Plaintiff's claims under section 10(b), Rule 10b-5, and section 20(a) of the Exchange Act.  With respect to the section 10(b) and Rule 10b-5 claims, Plaintiff should take note that, going forward, it can base liability on only the one omission and on the sole inference of scienter that the Court deemed to be properly pled.

An appropriate order follows.

_____

[25]   As noted above, Defendants also move to dismiss this claim on the basis of (1) Plaintiff's failure to properly plead it and (2) the statute of limitations.  With respect to the first contention, Defendants rely solely on their arguments with respect to the Rule 10b-5 claim.  (Defs.' Mem. Supp. Mot. Dismiss 29-30.)  However, for the same reasons the Court declined to dismiss the 10b-5 claim, we must decline to dismiss the Pennsylvania Securities Act claim.

As to the second contention, Defendants correctly argue that, under the state statute, "[n]o action shall be maintained to enforce any liability created under section 501 . . . unless brought before the expiration of five years after the act or transaction constituting the violation or the expiration of one year after the plaintiff receives actual notice or upon the exercise of reasonable diligence should have known of the facts constituting the violation, whichever shall first expire." 70 Pa. Cons. Stat. § 1-504 (2005).  Defendants contend that, as it argued with respect to the Rule 10b-5 claim, Plaintiff had ample notice of its state claim before May 20, 2008, one year before Count 3 was asserted.  (Defs.' Mem. Supp. Mot. Dismiss 30.)

This Court, however, declined to find the requisite storm warnings to dismiss the Rule 10b-5 claim as time-barred.  Although the statute of limitations for the state claim is significantly shorter, Defendants have pled no additional facts to establish that Plaintiff had the requisite storm warnings as of May 20, 2008 (notwithstanding the filing of the original complaint in June 2008). Moreover, the addition of the state claim may relate back to the filing of the initial complaint. See Fed. R. Civ. P. 15(c)(1)(B).  In any event, Defendants will have the opportunity to raise all of these issues in response to any motion for leave to amend that Plaintiff may file.