**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MILL BRIDGE V, INC. | : | |
| as successor to | : | |
| VAN DER MOOLEN OPTIONS USA, | : | |
| LLC c/o VAN DER MOOLEN | : | |
| SPECIALISTS, LLC, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | NO. 08-2806 |
| I. ISABELLE BENTON, | : | |
| BENTON PARTNERS II, LLP, | : | |
| JAMES KENKELEN, a transferee, and | : | |
| EILEEN WHITE, a transferee, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

BUCKWALTER, S.J.                                                  December 21, 2010

Currently pending before the Court is the Motion of Defendants Benton Partners II, LLP

and I. Isabelle Benton for Summary Judgment. For the following reasons, the Motion is granted

and judgment on the entirety of the Second Amended Complaint is entered in favor of

Defendants and against Plaintiff.

# I.  FACTUAL AND PROCEDURAL HISTORY

## A.  Factual Background[1]

### 1.  History and Facts About the Philadelphia Stock Exchange

The Philadelphia Stock Exchange, Inc. ("PHLX") was founded in 1790 and, since then, has continuously conducted business in the city of Philadelphia.  (Sec. Am. Compl. ¶ 15; Answer ¶ 15.)  The PHLX is registered under section 78f of the Exchange Act as a self-regulatory organization ("SRO") and, as such, is overseen by the Securities and Exchange Commission ("SEC").  (Sec. Am. Compl. ¶¶ 17-18; Answer ¶¶ 17-18.)  In addition to the federally promulgated rules and regulations, the PHLX also operates under its own set of rules and has an elected and appointed governing body.  (Sec. Am. Compl. ¶ 21; Answer ¶ 21.)  The PHLX officials include a chair, two vice-chairs, and members of the governing Board, who are responsible for the general operation of the PHLX.  (Sec. Am. Compl. ¶¶ 23, 25; Answer ¶¶ 23, 25.)  In addition, the Board designates members and non-members to serve on Standing Committees, such as Executive, Finance, Business Conduct, Floor Procedure, and Options.  (Sec. Am. Compl. ¶ 24; Answer ¶ 24.)

---

[1]  Plaintiff's Response Brief is replete with references to facts for which no evidence is either cited or provided.  To the extent it does so, the Court cannot consider any such "facts" when ruling on the summary judgment motion.  See Fed. R. Civ. P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial.").  Although Plaintiff asks this Court to rely on the previously-issued decision in Feinberg v. Benton, No. CIV.A.05-4847, 2007 WL 4355408 (E.D. Pa. Dec. 13, 2007), the Court declines to do so for the same reason we do not adopt the legal and factual findings made in that case, *i.e.* it is a different case with a different plaintiff.  In any event, Plaintiff should take note that were the Court to adopt the evidentiary determinations from that matter, we would be compelled to rule in Defendants' favor since, in that case, there was no showing of any insider trading by Benton or BPII.

Through January 20, 2004, the PHLX was operated as a not-for-profit mutual association incorporated in Delaware. (Sec. Am. Compl. ¶ 16; Answer ¶ 16.) There were 505 seats on the PHLX, with one of the seats owned by the PHLX itself. (Id.) Those who owned a "seat" on the PHLX effectively possessed an equity interest in the association and maintained the right to trade on the PHLX floor. (Id.) In November 2003, the seat owners ratified a demutualization plan, which converted seat holders into stock holders, making trading privileges separate from equity ownership. (Defs.' Statement of Undisputed Facts ("DSUF"), Ex. 1, Decl. of Meyer Frucher, ¶¶ 11-12, Apr. 14, 2010 ("Frucher Decl.").) The SEC approved the changes associated with the PHLX's demutualization on January 20, 2004. (Id. ¶ 13.) On January 24, 2004, the PHLX issued a press release announcing the demutualization, which quoted Meyer Frucher, former PHLX Chairman and CEO, as follows:

> We are now primed to move aggressively to capitalize on our strengths – our highly regarded proprietary technology that supports our equity, option and regulatory systems and our multiple licenses to trade stocks, options and futures – all are assets that we intend to leverage with potential strategic partners.

(Id. ¶ 14.) As explained by Frucher, demutualization gave the PHLX a "currency," in the form of newly-created PHLX shares, which it could use to attract and facilitate alliances with strategic partners. (Id. ¶ 15.)

## 2. The PHLX's Efforts to Attract Investors

As of 2004, the PHLX was still experiencing financial difficulties. (DSUF Ex. 5, Dep. of I. Isabelle Benton, 19:8-20, June 11, 2010 ("Benton Dep.").) Accordingly, Frucher began to contact a variety of organizations to see if they might be interested in becoming strategic partners of the PHLX. (Frucher Decl. ¶ 16.) In November of 2004, Frucher learned that Archipelago

Holdings, Inc. ("Arca"), a PHLX competitor, might be interested in merging with the Pacific Exchange, Inc.  (Id. ¶ 17.)  In or about the week before Thanksgiving 2004,[2] Frucher called Arca Board Member Richard Breeden to inquire as to whether Arca might consider a strategic transaction with the PHLX.  (Id. ¶ 18.)  Although Breeden could not speak to Arca's interest, he indicated that he would contact Arca management to inquire.  (Id. ¶ 20.)  The week following Thanksgiving, Breeden called Frucher back to report that Arca management was interested in exploring the prospect of a strategic transaction with the PHLX.  (Id. ¶ 21.)

In late November and early December 2004, Frucher had additional "introductory discussions" with representatives of Arca, both by telephone and in person, in which they gathered information about the PHLX and its technology.  (Id. ¶ 22.)  Arca and the PHLX entered into a confidentiality agreement, dated December 3, 2004, requiring the parties to keep confidential all non-public information divulged by the other party.  (DSUF Ex. 24.)  Frucher described these Arca discussions as follows:

> The first contact with Archipelago was made by me the week before Thanksgiving and there was no meetings or any discussion about anything in November of 2004, only one telephone call from me to a member of the Board asking if there might be an interest to have a discussion.  So the first meeting that we had was in December – actually, I can give you the exact date if it would be helpful, December 7 was the first getting-to-know-you meeting which was serendipitous because they happened to have been in Philadelphia on that date for another meeting.
>
> So there was no discussion other than one phone call in November.  There was one meeting in December in – on December 7th in Philadelphia in which we basically – blue sky, there was no – I wouldn't call it – it can't possibly be, by any standard of a definition, a negotiation or an extensive negotiation.  There was no – other than here's who we are, here's what you are, here's what we have, this is what we're interested in, this is what we're doing.
>
> The next meeting was in the middle of December and that meeting was not

---

[2]  The date of Thanksgiving 2004 was on November 25th.

a negotiation.  I would call it more of a due-diligence kind of meeting such that the only discussion in December was them becoming familiar with us and what assets of value we had.  So I would describe the actual events as, you know, telephone introduction November, the beginning of a process of them getting to know the Exchange and our assets in December, and no real conversations about the merger, a merger or what one merger would look like until mid January to late January, and then intensive negotiations from that point on that did not culminate in a deal.

(DSUF Ex. 6, Dep. of Meyer Frucher, 56:24-58:12, Oct. 10, 2007 ("Frucher Dep.").)  Frucher's

characterization of the conversations is corroborated by e-mails exchanged within the internal

ranks of Arca.  From December 10, 2004 to December 13, 2004, several Arca officers discussed

the upcoming due diligence sessions with the PHLX, who would be involved in those sessions,

and the "long" list of what would need to be accomplished before even considering a non-

binding term sheet.  (Pl.'s Resp. Mot. Summ. J., Ex. 3.)

Defendant Benton was not a participant in any of these discussions with Arca.  (DSUF

Ex. 3, Decl. of I. Isabelle Benton, ¶ 19 (July 12, 2010) ("Benton Decl.").)  Indeed, on December

15, 2004, during a meeting of the PHLX Board of Governors, Frucher advised the Board, for the

first time, that Arca was exploring the possibility of a strategic transaction with the PHLX.

(Frucher Decl. ¶ 23; Benton Dep. 80:5-14.)  Frucher also indicated that future transactions for

PHLX stock would be barred for Board members.  (Id. at 78:12-23.)  Benton explained that,

based on Frucher's representations, she understood there to be preliminary discussion only and

that, if the talks developed into anything substantial, senior management would inform the

Board.  (Id. at 81:15-24.)

Substantive discussions between the PHLX and Arca did not begin until mid to late

January 2005.  (Frucher Dep. 56:14-58:12.)  At the February 2005 Board meeting, a strategic

committee was formed, together with a subcommittee of Board members, to negotiate with Arca. (Benton Dep. 83:14-22; DSUF Ex. 25.) At the end of February 2005, Arca first presented a preliminary non-binding term sheet to the PHLX. (DSUF Ex. 5, Dep. of Nelson Chai 147:8-22, Mar. 13, 2007 ("Chai Dep.").) During this entire process, Arca continued to perform financial, technical, and regulatory due diligence. (Id. at 155:20-157:14.) Upon completion of due diligence in March 2005, Arca offered the PHLX $50 million dollars and the assumption of pension liabilities. (Id. at 156:14-157:9.)

In an April 18, 2005 memorandum issued by the Special Committee on Strategic Alliances, the PHLX indicated that "since late November 2004, management, with guidance from the Committee, conducted an extensive negotiation with Archipelago Holdings Inc. which has resulted in a relatively firm offer to acquire all the stock of the PHLX for $50 million in Archipelago stock (and/or partial cash)." (DSUF Ex. 25.) This offer was considered and rejected by the Board of Governors on April 20, 2005, as being inferior to other alternatives available to the PHLX and as not in the best long-term interests of PHLX's shareholders. (DSUF Ex. 13.) As such, no acquisition of PHLX by Arca ever occurred. (Id.; DSUF Ex. 4, Dep. of William Floyd-Jones 205:13-21, May 28, 2010 ("Floyd-Jones Dep.").)

### 3. Background of Plaintiff Mill Bridge V, Inc.

Van der Moolen Options U.S.A., LLC ("VDM") was a Delaware limited liability company that was also an indirect, wholly-owned subsidiary of Van Der Moolen Holding, N.V. (DSUF Ex. 28.) While the PHLX was still a no-stock membership corporation, VDM acquired six PHLX seats and used them to act as an equity options specialist and a market maker for options at the PHLX. (Floyd-Jones Dep. 130:12-131:13; DSUF Ex. 2, Decl. of Janet Bennett ¶ 5,

6

June 9, 2010 ("Bennett Decl.") .) By 2002, VDM also acquired two Philadelphia Board of Trade ("PBOT") membership shares for use in trading currency futures. (Floyd-Jones Dep. 131:25-132:10, 135:17-136:2.)

In December of 2003, VDM elected to end its activities as an equity options specialist and equity options market maker at the PHLX. (Bennett Decl. ¶ 7.) On December 12, 2003, VDM sold all of its PHLX specialist books to Susquehanna Investment Group, another trader at the PHLX. (Floyd-Jones Dep. 122:22-123:8.) By the end of the year, VDM no longer employed anyone to engage in trading at the PHLX, and, as of April 1, 2004, Janet Bennett was the only Philadelphia-based employee of VDM. (Bennett Decl. ¶¶ 8, 10; Floyd-Jones Dep. 124:8-12.). On January 23, 2004, VDM made a formal request to cancel its Permit Holders and to remove VDM as a member of the PHLX. (DSUF Ex. 30; Floyd-Jones Dep. 120:16-23.)

On August 22, 2005, pursuant to provisions of the Delaware General Corporation Law, VDM merged with, and into, Plaintiff Mill Bridge V, Inc. ("Mill Bridge V"). (Sec. Am. Compl. ¶ 13; Answer ¶ 13; Floyd-Jones Dep. 35:15-20.) The merger agreement provided that all of the property, rights, and privileges of VDM vested in Plaintiff Mill Bridge V. (Sec. Am. Compl. ¶ 14; Answer ¶ 14.) Mill Bridge V has no employees and was always a holding company that never actually engaged in any business. (Floyd-Jones Dep. 51:7-16.) It is a wholly-owned subsidiary of Van der Moolen Holdings, N.V. (Id. at 53:20-54:4.) In August 2009, Van Der Moolen Holding N.V. went through a liquidation-type bankruptcy in the Netherlands analogous to American Chapter 7-type proceedings. (Id. at 25:15-22.)

### 4. VDM's Sale of PHLX Stock to Defendants

Prior to closing its Philadelphia operations in 2004, VDM undertook to dispose of its assets. On Friday, December 3, 2004, during a telephone call with Frank Dorje, who was the CFO of Van Der Moolen Holdings, N.V., Janet Bennett was notified that VDM would end all of its operations and discharge all of its employees by December 31, 2004. (Bennett Decl. ¶¶ 11-12.) Accordingly, Dorje directed Bennett to liquidate all U.S.-based assets of VDM by December 31, 2004, and noted that such liquidation was "very important." (Id. ¶ 13 & Exs. A-B; DSUF Ex. 22.) Among the assets to be disposed of were six hundred shares of PHLX stock and two PBOT memberships. (Bennett Decl. ¶ 16.) Dorje remarked that any VDM assets that were not sold as of December 31, 2004 would have to be abandoned so as to recognize a tax loss by year end. (Id. ¶ 17; Floyd-Jones Dep. 137:12-138:8, 153:4–24.) At that time, VDM believed that the PHLX stock it owned was worthless or "as close to worthless as you could get." (Floyd-Jones Dep. 131:21-24; DSUF Ex. 31; DSUF Ex. 8, Dep. of Janet Bennett, 23:16-24:12, July 8, 2010 ("Bennett Dep.").)

On Monday, December 6, 2004, Bennett planned to speak with the PHLX regarding the sale of VDM's PHLX stock and PBOT seats. (DSUF Ex. 22.) That day, she met with PHLX employee and head of Shareholder Services Robert Kreszswick to find out how to sell VDM's PHLX and PBOT shares. (Bennett Decl. ¶ 18; Bennett Dep. 48:23-49:14.) During that meeting, Bennett indicated that she needed to sell all six hundred shares of PHLX stock "as quickly and easily as possible." (Bennett Decl. ¶ 21.) Kreszswick explained that trades of PHLX had to be done in one hundred share increments, which would be negotiated directly between the buyer and the seller, rather than through the PHLX. (Id. ¶ 20.) Immediately following this conversation,

Kreszswick forwarded an e-mail to Bennett with the contact information for the six persons or entities that were currently bidding for PHLX stock. (Id. ¶ 22; DSUF Ex. 23; Bennett Dep. 51:6-15.) The bids for PHLX stock as of that date ranged from $10,000 to $18,750 per 100 shares. (DSUF Ex. 23.) Kreszswick suggested that Bennett call Defendant Benton and then, depending on the response, work her way down the list. (Bennett Dep. 51:10-12; DSUF Ex. 23.) He further offered to help her with the paperwork once she had secured her commitments. (DSUF Ex. 23.) On the same day, Bennett also submitted an executed "Membership Sale Authorization" form asking the PHLX to purchase its two PBOT membership shares for $500 each. (DSUF Ex. 32.) In light of the significant amount of work involved with disposing of the assets of VDM by December 31, 2004, Bennett hoped to sell the PHLX shares quickly and in one transaction to dodge the inconvenience of six separate transactions. (Bennett Decl. ¶ 28.) Dorje had, in fact, already authorized Bennett to sell the PHLX shares in a single transaction at less than maximum potential price in order to avoid the time and effort associated with multiple transactions. (Id. ¶¶ 29-30.)

Defendant Isabelle Benton, a member of the PHLX's Board of Governors, was the only one of the list of current bidders known to Bennett. (Id. ¶ 24.) Bennett had worked in an office several doors down from Benton's in the PHLX building. (Id. ¶ 25.) In the fall of 2004, Benton was present at the PHLX offices approximately one to two times per month. (Benton Dep. 53:3-18.) Between September 1, 2004 and the December 2004 sale of VDM's PHLX shares, she had attended the only two PHLX Board meetings – one on September 22, 2004 and one on November 10, 2004. (Benton Decl. ¶ 17.) Prior to 2004, Benton and her company Benton Partners II, LLP ("BPII") had invested substantial sums to purchase PHLX seats and, at the time

of its November 2004 stock purchases, BPII already owned 200 shares of PHLX stock.  (DSUF Ex. 15; Benton Decl. ¶¶ 21-23; DSUF Ex. 10, Dep. of Corp. Rep. of BPII, 14:17-22, June 11, 2010 ("BPII Dep.").)

During the first half of November 2004, Benton had submitted a written request to the PHLX for approval to buy PHLX shares, which was two weeks before the initial contact between Arca and the PHLX.  (Benton Decl. ¶ 5; Benton Dep. 32:11-33:19; DSUF Ex. 16.)  In that letter, Benton affirmatively stated, "I do not believe that I am aware of privileged or confidential information that would affect the investment value of the PHLX stock."  (DSUF Ex. 16.) Sometime on or around November 17, 2004, Benton was given approval by the PHLX to trade. (DSUF Ex. 14; Benton Dep. 32:11-16, 33:16-24; Benton Decl. ¶ 6.)  On November 30, 2004, Benton purchased 100 shares from an individual named Richard Feinberg.  (Answer ¶¶ 26-27.)

Bennett initiated contact with Benton by placing a phone call to her on December 6, 2004.  (DSUF Ex. 23; Benton Decl. ¶ 7.)  On some date between December 7, 2004 and December 9, 2004, Bennett met with Defendant Benton in her office, explained VDM's immediate need to quickly sell its six hundred shares of PHLX stock, and emphasized her desire to sell all six hundred shares in one transaction.  (Bennett Decl. ¶¶ 32-33; Bennett Dep. 73:22-74:18; Benton Dep. 57:16-58:4.)  Bennett was the only employee of VDM that spoke directly with Defendant Benton regarding the sale of the 600 shares of PHLX stock and is the only VDM employee with actual personal knowledge as to the negotiations and efforts to sell that stock. (Floyd-Jones Dep. 143:4-13, 160:10-161:4, 166:21-167:5.)  Benton fully disclosed to Bennett that she was a member of several PHLX committees.  (Bennett Dep. 78:21-82:8.)  She then said that although she was interested, she needed to speak with her business associate about the

purchase of all 600 shares. (Bennett Decl. ¶ 34.) Shortly after speaking with Bennett, Defendant

Benton offered an individual named Daniel Carrigan – an acquaintance from the PHLX – the

opportunity to purchase 200 of the 600 shares of PHLX stock that VDM was selling. (Benton

Dep. 64:24-65-24; DSUF Ex. 9, Dep. of Daniel Carrigan, 26:19-29:24, June 11, 2010 ("Carrigan

Dep.").) Carrigan opted not to participate in the transaction. (Benton Dep. 65:17-24, 111:13-

23.) Benton later contacted Bennett to indicate that she would purchase all of VDM's PHLX

stock and, on some date between December 7 and December 9, 2004, offered $12,500 per 100

shares, for a total of $75,000. (Bennett Decl. ¶¶ 35-36; Benton Decl. ¶ 9, Floyd-Jones Dep.

165:12-24; Benton Dep. 64:7-5-8.) Bennett counter-offered and said that she could sell the

shares at $13,000 per 100. (Benton Dep. 64:17-23, Floyd-Jones Dep. 165:12-24; Benton Decl. ¶

10, Bennett Decl. ¶ 37.) Prior to coming to a price agreement with Defendants, VDM was aware

that bids and offers for PHLX stock were posted on the PHLX website. (Floyd-Jones Dep.

184:20-185:7.) Ultimately, sometime between December 7, 2004 and December 9, 2004, Benton

and Bennett confirmed that BPII would buy VDM's 600 shares of PHLX for $13,000 per 100

shares, for a total of $78,000. (Bennett Decl. ¶¶ 37-38; Bennett Dep. 78:15-79:12.) After this

oral agreement was reached, BPII, through Defendant Benton, offered another PHLX investor,

Richard Ross, the opportunity to purchase some of these shares, but Mr. Ross declined. (Benton

Dep. 65:25-66:25; 111:24-112:4.)

According to her testimony, Benton's decision to purchase VDM's shares was influenced

by the fact that the PHLX XL options trading system had become completely up and running

with no glitches, resulting in an increased volume of trades and options.[3]  (Benton Dep. 90:3-16.)

At that time, BPII was profitable and had more than a million dollars cash on hand.  (Id. at 31:10-

25, 88:13-21.)  The price paid by BPII for VDM's PHLX stock in December 2004 represented

less than 1% of BPII's total assets and less than 2.5% of BPII's total equity.  (Benton Decl. ¶ 18.)

On December 9, 2004, Bennett informed Dorje that she had sold all of VDM's shares of

PHLX to BPII for a total of $78,000.  (DSUF Ex. 22.)  That same day, VDM signed the PHLX

transferor representation certificate, evidencing the sale.  (DSUF Ex. 18.)  By way of letter dated

December 10, 2004, Benton indicated to the PHLX that she was buying 600 additional shares in

PHLX stock from VDM "after solicitation by and negotiation with" Janet Bennett and that she

was not aware of any privileged or confidential information that would affect the investment

value of the stock.  (DSUF Ex. 19.)  BPII delivered three checks in the total amount of $78,000

on December 10, 2004, representing full payment for the sale of PHLX stock.  (DSUF Ex. 33;

Bennett Dep. 113:12-25; Benton Dep. 73:16-19.)  The following Monday, December 13, 2004,

PHLX's Shareholder Services and Legal Departments authorized the transaction to proceed and

documentation was overnighted to the transfer agent for PHLX, making the effective date for the

transfer of title December 14, 2004.[4]  (Pl.'s Resp. Mot. Summ. J., Exs. 8-10.)

---

[3]  Plaintiff argues that the PHLX completed these improvements at least nine months
prior to the VDM-BPII trade, thereby casting doubt on Benton's explanation for her desire to buy
more stock.  Plaintiff, however, only cites to portions of Benton's deposition that it failed to
provide to the Court.  Absent evidence of this allegation, the Court declines to consider this
argument.

[4]  Plaintiff suggests that PHLX backdated its records to reflect a December 10, 2004
closing date of the transaction, when, in fact, the transfer date of title was December 14, 2004.
The undisputed evidence of record, however, reveals that the final agreement between VDM and
BPII was concluded as of December 9, 2004 and full payment was made as of December 10,
2004.  The events occurring on December 13 and 14, 2004 were simply administrative steps that

### 5.     Related Litigation

On September 5, 2005, Steven Mirow – Plaintiff's counsel in the present case –  filed a complaint on behalf of Richard Feinberg asserting insider trading claims against BPII and Benton.  Compl., Feinberg v. Benton, No. CIV.A.05-4847 (E.D. Pa. Sep. 9, 2005) ("Feinberg Complaint"); see also Feinberg v. Benton, No. CIV.A.05-4847, 2007 WL 4355408 (E.D. Pa. Dec. 13, 2007) (Memorandum and Order denying summary judgment).  The Feinberg Complaint claimed violation of Rule 10b-5 and control person liability against the defendants in connection with a November 30, 2004 sale by Feinberg to BPII of 100 shares of PHLX stock.  The case proceeded to a non-jury trial.  On July 2, 2008, the Court entered judgment for the defendants on all claims, finding that the defendants were not aware of any material inside information at the time they purchased stock from the plaintiff.  Judgment, Feinberg v. Benton, No. CIV.A.05-4847 (July 2, 2008).

### B.     Procedural History

On June 16, 2008, Mill Bridge V, LLC ("Mill Bridge LLC"), represented by Steven Mirow, brought suit against BPII and Benton claiming a violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5; seeking rescission under § 29(b) of the Securities Exchange Act, 15 U.S.C. § 78cc(b); and alleging control person liability under § 20(a) of the Exchange Act, 15 U.S.C. § 78t.  The Complaint asserted that BPII bought 600 shares of PHLX stock from VDM on December 10, 2004, without

_____

had to be taken by third-parties in order to formalize the transaction and had no effect on the actual agreement reached by the parties.  Given this evidence, together with Plaintiff's previous admissions that the agreement concluded by December 10, 2004 (Sec. Am. Compl. ¶ 4), the Court must caution Plaintiff against making unfounded accusations in its legal filings.

disclosing material non-public information, and that Mill Bridge LLC was the successor in interest to VDM. Defendants moved to dismiss the Complaint on various grounds and, in lieu of a response, Plaintiff's counsel asked for additional time to obtain documents from VDM in the Netherlands and determine if Mill Bridge LLC was the proper plaintiff. This Court dismissed the Complaint without prejudice and allotted a set period of time in which to file an amended complaint.

Plaintiff's counsel filed a new pleading entitled "First Amended Complaint," on October 20, 2008. This document was brought on behalf of current Plaintiff Mill Bridge V, Inc. and raised the identical claims. Defendants again brought a motion to dismiss, which was granted with instructions for Plaintiff to file a new complaint pled with more specificity. Plaintiff thus filed the current Second Amended Complaint, on May 20, 2009, which re-asserted the three causes of action from the prior iterations, and added a new claim under the Pennsylvania Securities Act, 70 Pa.C.S. §§ 1-401(a), 501(a). On June 4, 2009, Defendants moved to dismiss the Second Amended Complaint. By way of Memorandum and Order dated December 3, 2009, the Court dismissed Plaintiff's causes of action under § 29(b) of the Securities Exchange Act, 15 U.S.C. § 78cc(b) and under the Pennsylvania Securities Act, 70 Pa.C.S. § 1-401, 501. Mill Bridge V, Inc. v. Benton, No. CIV.A.08-2806, 2009 WL 4639641 (E.D. Pa. Dec. 3, 2009). Further, although the Court declined to dismiss Plaintiff's causes of action under § 10(b) and 15 U.S.C. § 78t, the accompanying Memorandum decision held that Plaintiff could base liability only on Defendants' alleged omission of their knowledge of the material merger negotiations between Arca and the PHLX since none of the other alleged misstatements or omissions withstood legal scrutiny. Id.

Defendants filed the present Motion for Summary Judgment on July 16, 2010. By stipulation of the parties, Plaintiff responded on August 30, 2010 and Defendants submitted a Reply Brief on September 16, 2010. The Court now turns to a discussion of this Motion.

## II.   STANDARD OF REVIEW ON A MOTION FOR SUMMARY JUDGMENT

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)). Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the

evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586. "[T]he non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Moreover, the mere existence of some evidence in support of the nonmovant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmovant on that issue. Anderson, 477 U.S. at 249-50.

## III. DISCUSSION

### A. Plaintiff's Section 10(b) Claim

Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") prohibits the use

of fraudulent schemes or devices in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b) (2000). "Pursuant to this statutory authority, the [SEC has] promulgated Rule 10b-5, which creates a private cause of action for investors harmed by materially false or misleading statements." In re Suprema Specialties, Inc. Secs. Litig., 438 F.3d 256, 275 (3d Cir. 2006). Rule 10b-5 proscribes, in connection with the purchase or sale of securities, the making of "any untrue statement of a material fact" or the omission of "a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5 (1951). To state a claim under § 10(b) and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005); In re Suprema, 438 F.3d at 275. The burden rests with the plaintiff to prove each of these elements. Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008).

Via the present Motion, Defendants assert that summary judgment must be granted on the § 10(b) claim because Plaintiff has not adduced sufficient evidence to create a genuine issue of material fact on any of the required factors. As Plaintiff's cause of action fails at the first element, the Court focuses solely on that issue.

The first element of a Rule 10b-5 claim demands that the plaintiff prove a material misrepresentation or omission by the defendant. Stoneridge, 552 U.S. at 157. To be actionable, the misstatements or omissions alleged by a plaintiff must be material to the reasonable investor.

"The issue is whether there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available to that investor."  Majer v. Sonex Research, Inc., 541 F. Supp. 2d 693, 704 (E.D. Pa. 2008) (citing Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988); Shapiro v. UJB Fin. Corp., 964 F.2d 272, 280 n.11 (3d Cir. 1992)).  Information is not material if it is speculative, unreliable, or contingent.  In re Rockefeller Ctr. Props., Inc. Secs. Litig., 184 F.3d 280, 290 (3d Cir. 1999).

In the December 3, 2009 ruling, this Court limited the case against Defendants to a sole possible omission:  whether Defendant Benton failed to disclose material information about the Arca/PHLX merger negotiations.  Specifically, the Court held:

> According to the Second Amended Complaint, the PHLX, in November 2004, began serious negotiations with Archipelago Holdings ("Arca"), that led to an offer to purchase the PHLX for $50 million, to be paid through a combination of cash and Arca stock. . . .  Arca and PHLX entered into a confidentiality agreement on December 3, 2004 to allow the parties to exchange information for purposes of negotiations. . . . Although the deal was ultimately never consummated, the negotiations had potential impact on PHLX stock by reflecting what an outside investor would pay for such stock – a price per share well above what Benton paid in her transaction with Plaintiff.  Indeed, as noted in the Second Amended Complaint, the PHLX issued a tender offer, on September 22, 2005, to buy up to 167 blocks of 100 shares at $900 per share from original Class A shareholders, which was the same price the shareholders would have received had the Arca deal closed. . . .

> Defendants now claim that the Second Amended Complaint "offers no facts to show that PHLX discussions with Arca had advanced to the stage of being material in early December 2004," thereby making any failure to disclose the information non-material. . . .  Defendants, however, do not dispute that the negotiations were occurring and do not suggest that the talks were at such an embryonic stage as to be irrelevant to an investor.  Moreover, according to the Second Amended Complaint, the PHLX-Arca discussions that began in early November 2004 were "serious negotiations" that culminated in a significant offer

> of cash and Arca stock. . . . Taking this allegation as true, and given both the dire financial information that PHLX shareholders had received about the state of the PHLX and the fact that shareholders had been informed of PHLX's need for a strategic investor or partner, there remains a "substantial likelihood" that information regarding talks with a potential strategic investor "[c]ould have assumed actual significance" in the deliberations of Plaintiff as a reasonable shareholder. In re Aetna, 34 F. Supp. 2d at 945.

Mill Bridge, 2009 WL 4639641, at *21 (citations to record omitted). Defendants now allege that Plaintiffs have failed to come forward with evidence to substantiate the allegations of the Second Amended Complaint on which the Court allowed the § 10(b) claim to proceed. Specifically, they contend that no evidence exists on which a reasonable factfinder could find that: (1) material merger negotiations between Arca and the PHLX were proceeding at the time that VDM sold its 600 shares of PHLX stock to BPII, or (2) Defendant Benton, as an insider, had knowledge of such merger discussions such that she could have disclosed them to Plaintiff prior to engaging in a stock transaction. The Court takes each argument in turn.

## 1.   **Materiality of Negotiations**

The primary inquiry is whether Plaintiff has shown that any talks between Arca and the PHLX were material, such that there is "a substantial likelihood that, under all the circumstances, the [omission] would have assumed actual significance in the deliberations of a reasonable investor." TSC Indus., Inc. v. Northway, 426 U.S. 438, 449 (1976). In Basic v. Levinson, 485 U.S. 224 (1988), the United States Supreme Court directly addressed the application of this materiality standard to preliminary merger negotiations. Id. at 232. At the outset, the Court rejected the notion, previously promulgated by the Third Circuit, that preliminary merger

discussions did not become material until "'agreement-in-principle' as to the price and structure of the transaction [had] been reached between would be merger partners." Id. at 236.  In doing so, it acknowledged that because a merger is one of the most important events that can occur for a company, insider information regarding a merger "can become material at an earlier stage than would be the case as regards lesser transactions." Id. at 238  (quoting SEC v. Geon Indus., Inc., 531 F.2d 39, 47 (2d Cir. 1976)).  Thereafter, the Court enunciated what it deemed a more suitable standard for classifying when merger negotiations become material:

> Whether merger discussions in any particular case are material therefore depends on the facts.  Generally, in order to assess the probability that the event will occur, a factfinder will need to look to indicia of interest in the transaction at the highest corporate levels.  Without attempting to catalog all such possible factors, we note by way of example that board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries may serve as indicia of interest.  To assess the magnitude of the transaction to the issuer of the securities allegedly manipulated, a factfinder will need to consider such facts as the size of the two corporate entities and of the potential premiums over market value.  No particular event or factor short of closing the transaction need be either necessary or sufficient by itself to render merger discussions material.

Id at 239.

Following the Supreme Court's lead, the Fourth Circuit, in the persuasive decision of Taylor v. First Union Corp. of S. Carolina, 857 F.2d 240 (4th Cir. 1988), expanded and clarified the bounds of this highly fact-specific inquiry.  The court, in that case, declared that where merger discussions are "preliminary, contingent, and speculative," they do not rise to the level of being material.  Id. at 244.  It acknowledged that, "[t]hose in business routinely discuss and exchange information on matters which may or may not eventuate in some future agreement.

Not every such business conversation gives rise to legal obligations." Id. It went on to explain:

> The more tentative the discussions the less useful such information will be to a reasonable investor in reaching a decision. Information of speculative and tentative discussions is of dubious and marginal significance to that decision. To hold otherwise would result in endless and bewildering guesses as to the need for disclosure, operate as a deterrent to the legitimate conduct of corporate operations, and threaten to 'bury the shareholders in an avalanche of trivial information;' the very perils that the limit on disclosure imposed by the materiality requirement serves to avoid.

Id. at 244-45 (quoting TSC Indus., 426 U.S. at 448-49); see also Gay v. Axline, No. CIV.A.93-1491, 1994 WL 159426, at *5 (1st Cir. Apr. 26, 1994) ("[T]he fact that discussion has begun about a project with a potentially substantial impact on a company's stock price ordinarily would not be material if the likelihood of its happening were extremely remote."); Levie v. Sears Roebuck & Co., 676 F. Supp. 2d 680, 688 (N.D. Ill. 2009) (noting that "[t]he materiality of information concerning a proposed merger is directly related to the likelihood that the merger would be accomplished," and finding that merger negotiations that were preliminary in nature at time of challenged transaction were not "material" for purposes of a 10(b) claim); Connelly v. Gen. Med. Corp., 880 F. Supp. 1100, 1114 (E.D. Va. 1995) (declining to find preliminary merger discussions to be material where "[t]he senior managers had, at most, only begun to form embryonic ideas about the sale of [defendant].").[5]

---

[5] Defendants cite to the case of SEC v. Gaspar, No. CIV.A.83-3037, 1985 WL 521, at *14-15 (S.D.N.Y. Apr. 16, 1985) for the proposition that in order to be material, negotiations had to have proceeded to the establishment of preconditions, the existence of proposals concerning price per share, and the existence of numerous meetings between the parties to work out the financing. This citation is in error since Gaspar was decided before the Supreme Court, in Basic, eschewed any such bright line test.

In the present case, a comprehensive review of the evidence of record reveals that, as of December 9, 2004, discussions between the PHLX and Arca regarding a possible merger were far from material. According to the uncontradicted testimony, in or about the week before Thanksgiving of 2004 (November 25, 2004), Meyer Frucher of the PHLX called Arca Board Member Richard Breeden to inquire into Arca's interest in a strategic transaction with the PHLX. (Frucher Decl. ¶ 18.) It was not until the week following Thanksgiving that Breeden was able to report back to Frucher that Arca management wanted to explore such a strategic transaction. (Id. ¶ 21.) Sometime during that week (from November 29, 2004 to December 3, 2004), Frucher had "introductory discussions" with Arca representatives, who indicated their desire to gather information about the PHLX and its technology. (Id. ¶ 22.) The week culminated in the two parties entering into a confidentiality agreement, dated December 3, 2004, designed to allow Arca to obtain proprietary PHLX information to evaluate a possible transaction. (DSUF Ex. 24.) The first somewhat formal meeting between the two sides occurred on December 7, 2004, (Frucher Dep. 56:24-58:12.) By December 9, 2004, an oral agreement for the sale of PHLX stock from VDM to Defendants had already been reached. (Bennett Decl. ¶¶ 37-38; Bennett Dep. 78:15-79:12.) Subsequently, on December 16, 2004, Arca began its due diligence, but substantive discussions as to the actual terms of any potential deal between the PHLX and Arca did not commence until mid to late January 2005. (Pl.'s Resp. Mot. Summ. J., Ex. 3; Frucher Dep. 56:14-58:12.) Indeed, the PHLX did not even form a strategic committee to negotiate with Arca until February 2005. (Benton Dep. 83:14-12; DSUF Ex. 25.) Arca CFO Nelson Chai

expressly stated that he did not present a preliminary non-binding term sheet until February 28, 2005 – three and half months after VDM's sale of its stock. (Chai Dep. 146:8-22.) No final offer from Arca was presented to the PHLX until April of 2005 and no deal was consummated. (Frucher Decl. 23; DSUF Ex. 13.)

In light of this evidence clearly revealing the embryonic nature of merger discussions in early December 2004, Plaintiff bears the burden of creating a genuine issue of fact as to the materiality of the discussions prior to December 9, 2004. In an effort to do so, Plaintiff references, without providing, a slew of evidence, all of which purportedly raises a question as to the veracity of the above timeline.[6] For clarity of discussion, the Court addresses each piece of evidence individually, but considers all such evidence comprehensively.

### a.    Deposition of Arca Board Member Richard Breeden

Plaintiff first contends that Arca Board Member Richard Breeden testified, in his deposition, that his initial contact with Frucher regarding a possible deal was in August 2004. Specifically, Breeden stated:

A.    I was a former board member of the Philadelphia Stock Exchange and still knew some of its operating officers and some of its board members, and so

_____

[6] To the extent Plaintiff argues in its Response to the Motion for Summary Judgment that it still has not received all necessary discovery, the Court finds that all fault for this absence of evidence lies with Plaintiff. Plaintiff was given ample time in this case to serve discovery on parties and non-parties, take depositions, and file necessary motions to compel. Nonetheless, Plaintiff's counsel chose to "sit on his hands" and wait until the very end of the discovery period (which was already extended by the Court at his request) to seek any of the documents which he claims exists. This lack of diligence, together with the fact that Plaintiff previously had the opportunity to conduct discovery on the very same issues in the Feinberg case, belies any suggestion that summary judgment at this point is unfair.

> I suggested the possibility that Arca should consider an acquisition – I suggested within Arca that they should consider a possible acquisition of the Philadelphia Stock Exchange, and was authorized to, since I knew people there, to try and see if there was any interest.
>
> Q.    What was the time frame when you were receiving this authorization to contact the Philadelphia Stock Exchange about an acquisition?
>
> A.    I don't recall.
>
> Q.    In 2004?
>
> A.    Probably, yeah.
>
> Q.    Okay.
>
> A.    Well, no, it might have been 2005.  I really don't know.  It was sometime after I went on the Arca board, but I don't recall the dates.
>
> Q.    Okay.  And did I understand right you joined the Arca board in 2004?
>
> A.    I don't remember the date, but whatever the date of its initial public offering, on the day the offering closed, the new board – there was a predecessor board – when the IPO happened, we had a number of people identified in the prospectus and registration statement who would become the board on the closing of the IPO.  I think it was August of 2004, but I don't recall the exact date.

(Defs.' Reply Br., Ex. C, Dep. of Richard Breeden, 8:23-10:6 (May 14, 2007) ("Breeden Dep.").)[7]  Plaintiff uses this testimony in an effort to contradict Frucher's representation that negotiations did not begin until November 2004.

While Plaintiff's interpretation of this testimony is creative, a plain reading of the

---

[7]  The Court relies on the evidence provided by Defendants since Plaintiff fails to either submit a copy of the relevant portion of Breeden's deposition or specify the pages which support its argument.

transcript reveals only that Breeden could not recall the date he first spoke with Frucher about the acquisition, but knew it happened sometime after he joined the Arca Board in August 2004.  (Id.) Certainly, such speculation and plain admission of a faulty memory by Breeden cannot overcome or undermine Frucher's direct and substantiated averment that his first conversation with Breeden regarding an Arca acquisition occurred the week before Thanksgiving 2004.  (Frucher Decl. ¶ 18.)

> b. <u>Deposition of Arca CFO Nelson Chai</u>

In an alternative effort to undermine Frucher's version of events, Plaintiff also references the deposition of Nelson Chai, CFO of Arca.  According to Plaintiff, Chai testified that he participated in five to ten meetings with the PHLX regarding a possible Arca takeover, the first of which was in the October 2004 time frame:[8]

> Q.    But for me personally, I believe the first discussions I had with them [PHLX] was somewhere around the early – the fall of 2004.  And so I met – I had lunch with Sandy Frucher and a couple other members of management of the Philadelphia Stock Exchange.
>
> Q.    And who initiated that meeting which you say is in the fall of 2004?
>
> A.    I believe it was – the meeting was facilitated by Richard Breeden, who was at the time a member of the Board at Archipelago and had previous – I believe he was on the Board of Philadelphia at a previous juncture.
>
> Q.    So Mr. Breeden initiated this meeting between the Philadelphia Stock Exchange and Archipelago at that time?
>
> A.    Yes.

---

[8]  Again, Plaintiff neither provided Mr. Chai's deposition nor cited specific pages.

(Defs.' Reply Br., Ex. D, Dep. of Nelson Chai, 18:6-23, Mar. 13, 2007 ("Chai Dep.").) In addition, during a related matter – <u>In re NYSE/ARCA Merger Litig.</u> – Mr. Chai testified that "[t]o the best of [his] memory, [discussions with respect to a possible transaction with the PHLX] started in the October timeframe 2004." (Defs.' Reply Br. 7.)[9]

Such unclear and speculative statements again do not create any genuine issue of fact. Mr. Chai notably declined to pinpoint a specific date for the commencement of talks and conceded that his "timeframe" was merely a guess. In addition, when suggesting that talks of a possible transaction may have begun in October, Mr. Chai did not specify whether they were actual talks with the PHLX, as opposed to internal talks within Arca. Finally, to the extent his testimony could possibly be read to state that discussions with the PHLX began in October 2004, any suggestion that those discussions were material is undermined by a series of e-mails in which Mr. Chai was a participant. Those e-mails, dated in the first week of December, reveal that the initial meetings in which due diligence was planned were to start December 10, 2004. (Defs.' Reply Br. Ex. B.) As of that date, Mr. Chai, on behalf of Arca, was just putting together a team to begin the process of due diligence of PHLX during December 16-17, 2004. Thus, far from undermining Frucher's testimony as to the start of discussions, Chai's deposition and e-mails confirm the timeline provided by Frucher.

---

[9] Neither party was able to provide a copy of Mr. Chai's deposition from the previous litigation. Defendant directly quotes from his testimony, however, whereas Plaintiff only paraphrases. For purposes of this Motion, the Court considers the direct quote.

Internal Report Issued on April 18, 2005 by the Special Committee on Strategic Alliances

In its third attempt to contradict Frucher's attested timeline, Plaintiff cites to (again without supplying) the April 18, 2005 internal report issued by the Special Committee on Strategic Alliances.  This report was purportedly to be used only at a meeting of the whole PHLX Board, on April 20, 2005, to decide whether to accept the bid from Arca to buy the PHLX.  (DSUF Ex. 25.)  The Report stated, in part, "[a]s discussed in detail below, *since late November 2004,* management, with guidance from the Committee, conducted an extensive negotiation with Archipelago Holdings, Inc. which has result in a relatively firm offer to acquire all the stock of the PHLX for $50 million in Archipelago stock (and/or partial cash)."  (Id. (emphasis added).)  The Report went on to set forth the details of the offer and why it was in the best interests of the PHLX to reject it.  (Id.)  Plaintiff now argues that the implication from the Report is that "extensive negotiations began in late November 2004 . . . meaning they almost certainly began sometime before the transaction between Benton and Plaintiff, which took place on November 30, 2004, the last day of that month."[10]  (Pl.'s Resp. Mot. Summ. J. 21-22.)

Again, Plaintiff asks the Court to make a completely unreasonable inference.  First, the Report makes no representation that, as of late November 2004, negotiations were material.  It only suggests that they had begun at that time.  Second, as noted above, by December 10, 2004, Arca had not even fully assembled a team to *begin* due diligence, meaning that substantive

---

[10]  The Court notes that Plaintiff's brief is mistaken on this point as both parties have conceded, and the undisputed evidence shows, that the oral agreement between VDM and Defendants was reached sometime between December 7 and December 9, 2004.

discussion could not have even started, let alone reached the point of materiality. (Pl.'s Resp. Mot. Summ. J., Ex. 3.) Finally, to the extent a contradiction can be found, any statement in the Report is not sufficient to create a genuine issue of material fact. The Special Committee, which authored the Report, was first created in February 2005 and, thus, could not have spoken from personal knowledge as to the substance of the negotiations in November 2004. Any representation it makes on that subject is therefore inadmissible. See FED. R. EVID. 602 ("A witness may not testify as to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

### d. The PHLX's Misrepresentation of its Financial State

Absent an ability to directly counter Frucher's testimony, Plaintiff asks this Court to consider more circumstantial evidence of the materiality of the negotiations. Referencing the PHLX's October 2003 representation to its stockholders that it was in "dire financial straits" and may need to file for bankruptcy protection, Plaintiff makes the theoretical leap that, as a result of such grim projections, investors in the PHLX would have found that any negotiations between PHLX and Arca regarding a possible acquisitions would have been material.

Such an argument, however, again fails to create any genuine issue of fact as to materiality. Primarily, Plaintiff presents no evidence of the statement, either by way of a copy or deposition testimony describing it, leaving this Court devoid of acceptable Rule 56 evidence. Moreover, even accepting as true the description of the statement presented by the Second Amended Complaint, the Court notes that this representation was made in October of 2003 in

connection with emphasizing to seatholders the PHLX's need to demutualize. The seatholders voted in favor of demutualization, which, after SEC approval, ultimately occurred in January of 2004. Following this event, financial projections for the PHLX changed. Indeed, Frucher affirmatively advised the public of the PHLX's intent to seek out possible investors by noting that, "[w]e are now primed to move aggressively to capitalize on our strengths – our highly regarded proprietary technology that supports our equity, option and regulatory systems and our multiple licenses to trade stocks, options and futures – all are assets that we intend to leverage with potential strategic partners." (Frucher Decl. ¶ 14.) The start of talks with Arca fell in line with such representations. No evidence suggests the existence of any further statements about the PHLX's financial situation were made after that time, which would make disclosure of the commencement of the Arca discussions – occurring more than eleven months later – relevant to a reasonable investor.

e.       Trades by Insiders

Plaintiff next suggests that, prior to the purported bar to "insiders" trading in PHLX on December 15, 2004, there were hundreds of shares traded by "insiders" – including Daniel Carrigan and BPII – which ultimately translated into very large profit making. Such trades, according to Plaintiff, must, by sheer logic, evidence knowledge of some material information.

Again, however, Plaintiff provides no evidentiary support for this contention, leaving the Court unable to accept assess its veracity. Even if such support existed, the Court does not comprehend how these facts translate into a specific finding that the *Arca/PHLX* discussions –

the only event at issue – were material as of late November 2004.

f.     The December 3, 2004 Confidentiality Agreement

Finally, Plaintiff contends that the December 3, 2004 confidentiality agreement between the PHLX and Arca is "in and of itself sufficient evidence that the negotiations being conducted had reached a point where knowledge of those negotiations would be considered material information."  (Pl.'s Resp. Mot. Summ. J. 32.)  It goes on to reason that,

> [t]o assert . . . that such an agreement, which required corporate action by both parties as well as imposing obligations upon not only Arca and the Phlx, but their affiliates and representatives, including directors, officers, and employees, would be concluded after one or two casual phone conversations and before any determination had been made to engage in serious discussions defies common sense, logic, and most importantly, experience.

(Id. at 32-33.)

Plaintiff's invocation of common sense, logic, and experience, however, evidences a fundamental misunderstanding of corporate negotiation.  "Companies considering a merger frequently share 'significant quantities of competitively sensitive information regarding their respective businesses in the course of investigatory due diligence' in order for each party to determine whether the business deal makes sense."  Omnicare, Inc. v. UnitedHealth Group, Inc., 594 F. Supp. 2d 945, 950 n.2 (N.D. Ill. 2009) (quoting ANTITRUST ADVISER § 3:74, at 3-270 (Irving Scher ed., 4th ed. 2007)); see also Bertil Lundqvist, "Managing and Directing the Legal Due Diligence Process," 1146 PLI/CORP. 29, 31 (1999) ("The legal due diligence effort in an acquisition transaction provides to the acquiror the opportunity to identify, from both a legal and business perspective, the possible liabilities arising from the target's business following the

consummation of the transaction."). In order to engage in such due diligence without fear of information used competitively against a company, parties interested in exploring a merger will often enter into a confidentiality agreement.[11] Given that due diligence is simply the exploration of *the propriety* of doing a business deal, plain reason intimates that a confidentiality agreement entered into in anticipation of such due diligence would not reflect the start of material negotiations.[12]

---

[11] Notably, "[c]onfidentiality agreements are a must before diligence may begin. The typical confidentiality agreement . . . specifies that it is being entered into in contemplation of a negotiated merger and covers information that may have been exchanged before execution of the agreement as well as information that is exchanged afterwards." Edward P. Hehihy et al., "Mergers and Acquisitions of Financial Institutions: Deal Activity Continues in Rich Diversity,1521 PLI/CORP 235, 401 (2005). Such an agreement "protects the disclosing party from unwanted disclosure and misappropriation of confidential information while enabling the receiving party to gain access to information that is not publicly available in order to conduct due diligence and evaluate and fully-price the transaction." Meryl S. Rosenblatt, "Letters of Intent and Exclusivity, Confidentiality and Standstill Agreements," 1459 PLI/CORP 215, 231 (2004-05). The confidentiality agreement is often entered into *at the outset* of the process before any material terms are negotiated. Id.

[12] At oral argument, Plaintiff's counsel referenced a Delaware Chancery Court case – In re Fort Howard Corp. Shareholders Litig., No. CIV.A.88-9991, 1988 WL 83147 (Del. Ch. 1988) – for the proposition that the entry of a confidentiality/standstill agreement evidences the materiality of merger negotiations. That case, however, is entirely distinguishable. In Fort Howard, the parties had, like in the present matter, entered into a preliminary confidentiality and one-year standstill agreement in order to commence due diligence and preliminary analyses. Id. at *4. Almost two months later, after there had been market tests, proposals, and initial tender offers, a special committee for one of the potential acquiring companies requested particular information and facility inspections. Id. The target company then prepared a new confidentiality/standstill agreement with "several unusual features" not included in the original agreement, that noted that "in order to see further information about the Company, Company A would have to agree to be liable to [target company] in the amount of $67.8 million if Company A (1) was provided with access to the information sought, (2) made no bid, (3) the Management Group's tender offer did not close, and (4) a substitute for it did not eventuate." Id. at *9. As the Court noted, such an agreement was designed to make sure a deal was consummated since no

g.       Conclusion as to Materiality

In sum, all of the evidence of record establishes that Arca and PHLX had yet to engage in

"material" negotiations that should have been disclosed to a reasonable investor as of the date

that VDM sold its PHLX stock to Defendants.[13]   The undisputed evidence unequivocally

demonstrates that, as of December 10, 2004, Arca and the PHLX had not even met to begun due

diligence, let alone commenced substantive talks over what a possible acquisition would look

like or what terms would be involved.   Reflective of the weakness of Plaintiff's contrary

argument is the absence of quality (as opposed to quantity) evidence to support its position.

Aside from a December 3, 2004 confidentiality agreement and deposition testimony that is

blatantly vague and speculative as to time frames for even introductory phone conversations

between the PHLX and Arca, Plaintiff offers no evidence of any meetings, e-mail exchanges,

-------------------------

reasonable company would take such a risk without full intent to close an agreement.  Id.
        Quite to the contrary in this case, the confidentiality/standstill agreement was entered into
solely with the intention of allowing the parties to exchange information for purposes of deciding
whether a transaction was feasible.  No party took any risk and nothing in the agreement
suggested that any type of deal was either imminent or expected.


        [13]  Plaintiff also references this Court's December 3, 2009 Memorandum and Order
wherein the Court found that "the commencement of negotiations regarding a transaction that
could provide a significant influx of capital into a near bankrupt Exchange falls within the core
of PHLX's business and was knowable to a person sitting on PHLX's Executive Committee."
Mill Bridge V, 2009 WL 4639641, at *31.  Notably, however, the Court made such a statement
only after taking *all* of the allegations in the Second Amended Complaint as true, particularly the
statement that "according to the Second Amended Complaint, the PHLX-Arca discussions that
began in early November 2004 were 'serious negotiations' that culminated in a significant offer
of cash and Arca stock."  Id. at *21.  To the extent the Complaint's allegations are now
undermined by admissible evidence, the Court is no longer bound to accept them as true.

letters, or other conversations that would suggest that any material negotiations had occurred on or before the date of the VDM/BPII transaction. Similarly, Plaintiff points to no Board resolutions, instructions to investment bankers, engagement of law firms, or expenditure of *any* time performing due diligence. See Taylor, 857 F.2d at 244 (noting that predicates for a merger were not in place because there was "no evidence of board resolutions, actual negotiations, or instructions to investment bankers to facilitate a merger"); Castellano v. Rubicam, Inc., 257 F.3d 171, 185 (2d Cir. 2001) (finding merger discussions material where the plaintiff could point to engagement of law firms and investment bankers, the parties' entrance into a confidentiality agreement, and *extensive* due diligence); Levie, 676 F. Supp. 2d at 687-88 (finding that although each company had raised subject of merger with outside advisors and senior management of companies held discussions about strategic combinations, companies had not yet reached even a "general agreement" about the structure of a possible transaction and had not yet begun due diligence; accordingly negotiations were only "preliminary in nature"). To hold that the tentative and speculative discussions at this juncture were "material" so as to require disclosure to a potential investor would "operate as a deterrent to the legitimate conduct of corporate operations, and threaten to 'bury the shareholders in an avalanche of trivial information.'" Taylor, 857 F.2d at 245. Declining to allow such a result, the Court holds that, as of the date that the transaction between VDM and Defendants was consummated, no material negotiations had begun regarding a possible acquisition of the PHLX by Arca.

## 2. Defendant Benton's Knowledge of Arca Negotiations

Even assuming *arguendo* that the discussions between the PHLX and Arca were material as of December 10, 2004, Plaintiff has failed to create any genuine issue of fact as to Benton's knowledge of those discussions. Because Benton could not have possibly either traded on material inside information or disclosed such information to VDM without some cognizance of the PHLX/Arca talks, the Court must grant summary judgment on this basis as well.

Repeatedly, at various points both in this litigation and previous litigation, Defendant Benton has stated, under oath, that she did not know of the Arca/PHLX discussions at the time her company purchased VDM's shares. In her Declaration dated July 12, 2010, she averred that when VDM sold its 600 PHLX shares to BPII in December 2004, she did not know that Arca was engaged in preliminary discussions with the PHLX regarding a potential investment in the PHLX, and was not even aware of any interest by Arca in acquiring an equity interest in the PHLX. (Benton Decl. ¶¶ 13-14.) According to her Declaration, she did not learn that any such preliminary discussions had taken place until Meyer Frucher first mentioned it at the PHLX Board of Governors meeting on December 15, 2004. (Id. ¶ 15.) Similarly, in her deposition taken in this case on June 11, 2010, Benton stated that she first became aware that PHLX senior management had begun discussion with Arca at the December 15, 2004 Board meeting. (Benton Dep. 51:21-53:2.) She further affirmed that she had been at the PHLX offices only once or twice a month since September 1, 2004. (Id. at 53:3-54:6.) Finally, during the Feinberg v. Benton trial, at which time Benton was again expressly questioned as to her knowledge of the

Arca/PHLX discussions, Benton testified that she first learned that Arca had an interest in the PHLX at the December 15, 2004 Board Meeting. (DSUF Ex. 11, Tr. Trans. 50:5-7, Mar. 4, 2008.) Via his April 14, 2010 deposition, Meyer Frucher substantiated Benton's testimony by attesting that (1) he first advised the Board that Arca was exploring a possible strategic transaction with the PHLX on December 15, 2004; and (2) at no time prior to December 15, 2004 did he tell Benton either that PHLX was discussing with Arca a possible strategic transaction or that he had had discussions with Arca representatives in late November and early December 2004. (Frucher Decl. ¶¶ 23-25.)

Benton's and Frucher's testimony is circumstantially bolstered by testimony from Plaintiff's own former employee, Janet Bennett, who was the only person to negotiate with Benton regarding VDM's sale of PHLX stock. By all accounts, Bennett initiated contact with Benton on December 6, 2004 to express VDM's desire to sell its 600 shares of PHLX stock; Benton did not seek out such a large quantity of shares. (DSUF Ex. 23.) Indeed, Benton initially hesitated, (Bennett Decl. ¶ 34), and asked other investors to share in the acquisition of the stock, (Carrigan Dep. 26:19-29:24; Benton Dep. 65:25-66:25; 111:24-112:4), implying a lack of knowledge regarding the potential profitability of that stock. Ultimately Benton agreed to purchase all of the stock and reached a mutually agreeable oral contract with Bennett. (Bennett Decl. ¶¶ 37-38.)

Given such an evidentiary showing, the burden again falls on Plaintiff to come forward with some evidence on which a trier of fact could reasonably find that Benton had some

knowledge of the Arca discussions.[14]  Although Plaintiff consumes multiple pages of briefing

pontificating about this issue, it fails to present any evidence that could possibly create a genuine

issue of material fact on this precise question.  For purposes of comprehensiveness, however, the

Court takes each of Plaintiff's arguments individually.

a.    <u>Knowledge of the True Benefits of Demutualization</u>

Plaintiff first argues that Benton was informed by senior members of the PHLX

management of the great value of the PHLX, which was information not available to the public.

In support of this fact, Plaintiff cites to the affidavit of Lawrence Gage, who attested that he was

present at a Board meeting with Benton in early 2003.  (Pl.'s Resp. Mot. Summ. J., Ex. 13, Aff.

of Lawrence Gage ¶ 11 ("Gage Aff.").)  At that time, two members of senior PHLX management

addressed the value of the PHLX and indicated that demutualization would allow the PHLX to

unlock and realize its inherent or intrinsic value, which may have been well in excess of $250

million.  This statement alone, according to Plaintiff, reveals Benton's knowledge of material,

inside information that she failed to disclose.

Such reasoning, however, fails for multiple reasons.  First, it disregards this Court's prior

express order that liability could be based only on the one omission found to be properly pled –

---

[14]  To the extent that Plaintiff argues that Benton had knowledge of and should have
disclosed PHLX's negotiations with a potential investor named Citadel, its argument is
misplaced.  The evidence is clear that although the PHLX had exploratory discussions with
Citadel, as of December 2004, the Citadel discussions had ceased altogether due to the PHLX's
inability to deliver "a satisfactory portfolio of specialist books (a 'footprint') and Citadel went
elsewhere."  (DSUF Ex. 25.)  Moreover, as repeatedly established by this Court, the only alleged
material omission at issue is Defendants' failure to disclose information about the Arca
negotiations.

Defendants' failure to disclose knowledge of the Arca deal. <u>Mill Bridge V</u>, 2009 WL 4639641, at *35. To the extent Plaintiff relies on Defendants' omission of information about demutualization and its potential, that allegation is no longer part of this case.

Second, even were the Court to consider the evidence, it is not probative of what Defendant Benton knew at or shortly before the time that it entered into the deal to purchase PHLX stock from VDM. The demutualization about which Mr. Gage talks was approved by seat owners in November 2003 and by the SEC in January 2004. By his own admission, Mr. Gage left the PHLX Board in March 2004, well before any discussions with Arca commenced and before VDM contacted Benton about the sale of its shares. (Gage Aff. ¶ 7.) Nothing in his statement proposes any knowledge of what Benton knew in the fall of 2004.

Finally, Mr. Gage averred only that Benton knew that demutualization would do more than save the PHLX from failing; it would unlock its great value. Assuming that information was not made public prior to the seatholder vote on demutualization, it certainly became public after the actual demutualization, as evidence by the January 31, 2004 press release wherein CEO Frucher noted, "[w]e are now primed to move aggressively to capitalize on our strengths – our highly regarded proprietary technology that supports our equity, option and regulatory systems and our multiple licenses to trade stocks, options and futures – all are assets that we intend to leverage with potential strategic partners." (DSUF Ex. 12.) He went on to state, "[w]ith our financial strength, our track record of growth and our key assets, we're looking to ally with strong, innovative third parties." (<u>Id.</u>) In light of such disclosures, Gage's statement referencing

information from early 2003 is not probative of any inside knowledge possessed by Benton of the Arca negotiations in late 2004.

b.     The December 3, 2004 Confidentiality Agreement

Plaintiff next argues that the December 3, 2004 confidentiality agreement concluded between the PHLX and Arca constituted corporate action that was required to have been authorized either by the Board itself or by the Executive committee under a delegation from the Board. (Pl.'s Resp. Mot. Summ. J. 34.) Plaintiff reasons that "[p]roceeding by analogy" from how the Board normally operates, the Board must have authorized Frucher to act on December 3, 2004, meaning that Benton, as a member of the Board, must have known about the agreement. (Id.) Plaintiff goes on to note that the December 3, 2004 Confidentiality Agreement bound PHLX and its corporate representatives and imposed on them certain obligations. As a result, Plaintiff asserts that it "seems highly unlikely" that Frucher did not tell these officers and directors – including Benton – of such obligations until December 15, 2004. (Id. at 35.)

Aside from broad speculation, Plaintiff offers no concrete evidence – such as Board meeting minutes, deposition testimony, affidavits, documents, e-mails, etc. – that the Board of the PHLX had to engage in any delegation of authority to allow Frucher to enter into a confidentiality agreement with Arca for purposes of beginning preliminary discussions. Rather, Plaintiff merely hypothesizes, based on testimony from Benton from a prior trial (not provided by Plaintiff), that the Board would have to approve such a transaction. Such inferences are

38

impermissible.[15]  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586

(1986) (the party opposing summary judgment "must do more than simply show that there is

some metaphysical doubt as to the material facts," but must produce competent evidence

supporting their opposition.); Helfrich v. Lehigh Valley Hosp., No. CIV.A.03-5793, 2005 WL

670299, at *7 (E.D. Pa. Mar. 18, 2005) ("[T]he non-moving party cannot rely on unsupported

assertions, conclusory allegations, or mere suspicions in attempting to survive a summary

judgment motion.").

According to the definitive evidence of record before the Court, prior to the December

15, 2004 Board meeting at which Frucher divulged the talks with Arca and the confidentiality

agreement, the last Board meeting was on November 10, 2004.  (Benton Decl. ¶ 17.)  The first

_____

[15]  During oral argument, Plaintiff's counsel cited to the Third Circuit case of
Schoonejongen v. Curtiss-Wright Corp., 143 F.3d 120 (3d Cir. 1998), for the proposition that
Delaware law requires board action to give a corporate officer authority to enter into a
confidentiality and standstill agreement.  The Court does not find this case to support Plaintiff's
argument.  First, nothing in that case dealt with an officer's authority to enter into confidentiality
or standstill agreements in anticipation of a potential transaction.  Moreover, the Third Circuit
affirmatively recognized that "[b]eyond the board of directors, the corporation may validly act
through its directors and officers as authorized corporate agents," and that such authority may be
express – as manifested through a statute, the corporate documents, or a board or shareholder
action – or implied – as found through evidence as to the manner in which the business has
operated in the past.  Id. at 127-28.  The Third Circuit specifically remarked that the corporate
president in that case possessed the express authority to amend the employee benefit plan without
the board's prior approval, based on the corporate by-laws.  Id. at 128.
    In the present matter, Plaintiff has offered no evidence to create a genuine issue of fact as
to whether Frucher was able to enter into the confidentiality/standstill agreement without prior
Board approval.  To the contrary, the evidence reveals that Frucher properly signed the
agreement as chairman and CEO of the PHLX and then presented the agreement to the Board at
the subsequent meeting.

contact between Arca and the PHLX, however, was the week before Thanksgiving 2004 (sometime between November 15 and November 19, 2004) and the Confidentiality Agreement was not entered into until December 3, 2004. Basic logic dictates, then, that the Board, including Benton, could have had no involvement in or knowledge of the Confidentiality Agreement before December 15. (Frucher Decl. ¶¶ 23-25.)

Moreover, the mere fact that the Agreement imposed obligations on the Board as of December 3, 2004 does not suggest that it must have known about it at that time in order to comply. Arca and the PHLX did not begin the exchange of confidential information until, at the earliest, the December 16, 2004 due diligence meeting, meaning that the Board had no compliance duties. As of December 16, the Board had been fully apprised of the start of the Arca discussions and the existence of the Confidentiality Agreement. As such, the Court declines to imply Benton's knowledge from the mere existence of this document.

c.    <u>False Testimony by Benton and Frucher</u>

Plaintiff next challenges Defendants' reliance on statements from both Benton and Frucher to prove that Benton was unaware of the negotiations between the PHLX and Arca until December 15, 2004. It asserts that, "a fact finder may choose to find their testimony not credible in part or in whole due to conflicting testimony from others or their own that was made at different times in other cases or even with documentary evidence that has been produced in discovery." (Pl.'s Resp. Mot. Summ. J. 33.)

Such a vague challenge to credibility is inadequate to defeat summary judgment. The law

is clear that "[w]hen a witness's credibility is critical to supporting the necessary findings of fact, the District Court must consider whether there are sufficient grounds for impeachment that would place the facts to which he testifies in legitimate dispute." El v. Se. Pa. Transp. Auth., 479 F.3d 232, 237 (3d Cir. 2007). Plaintiff has not, however, established sufficient grounds for impeachment of either Frucher or Benton. As set forth in detail above, Benton's and Frucher's versions of the facts are entirely consistent with each other and with all deposition testimony and documentary evidence presented to the Court. Moreover, any inconsistencies identified by Plaintiff stand unsupported by the evidence, making them nothing more than speculation that a jury could choose to disbelieve these witnesses based on alleged "conflicting testimony" from other proceedings. Absent more specificity by Plaintiff, the Court must reject this argument.[16]

---

[16] Plaintiff provides no examples of inconsistencies in Defendant Benton's testimony and gives one example only as to Defendant Frucher. Specifically, Plaintiff notes that during the prior case of Pennmont v. Wallace, Frucher testified that prior to demutualization of the PHLX there was only one valuation of the PHLX made in connection with the "Kwok Li deal." Plaintiff now contends that it has evidence (which it has not provided to this Court) that another valuation of the PHLX was done in late 2001. It goes on to conclude that "[w]hether or not a fact finder would view this as a memory lapse and how that fact finder would then view Mr. Frucher's other testimony cannot be known at this time but it does mean that his affidavit for this case should be given no weight." (Pl.'s Resp. Mot. Summ. J. 34.)

The Court rejects this argument. The Court has before it no evidence – other than Plaintiff's counsel's representations – of any inconsistency. Further, the sole identified inconsistency has to do with an issue that is not part of this case and likely will not even be raised during trial. Plaintiff cannot create a genuine issue of material fact as to the critical issue in this matter, by pointing to, without providing supporting evidence on, an insignificant inconsistency in a witness's testimony in another proceeding on an entirely unrelated issue. Finally, even if a jury could reject Frucher's statements regarding the Arca negotiations based on this single irrelevant inconsistency, Plaintiff fails to offer any basis on which to either affirmatively find that Benton had earlier knowledge of the Arca negotiations or discount the plethora of other evidence establishing that she had no such until December 15, 2004.

c.    The December 3, 2004 Memorandum by William Briggs

In a final effort to avoid summary judgment, Plaintiff argues that Benton, by sole virtue of

her position on the Executive Board of the PHLX, was privy to certain inside information.  It

goes on to contend that Benton received a Memorandum from an individual named William

Briggs and directed to the Finance Committee, updating the members as to the benefits of the

new electronic trading system of the PHLX.  Via this memorandum, Benton purportedly learned

of non-public information that by implementing the new system, the PHLX "was likely to be able

to proceed with deal making to bring in capital and would not be closing its doors."  (Pl.'s Resp.

Mot. Summ. J. 35-36.)

Again, however, Plaintiff's contention is nothing more than a request that the Court make

a leap of faith to assume that because Benton was a member of the PHLX Executive Board, she

must have been aware of the Arca negotiations.[17]  The Court declines to do so for several

reasons.  First, the William Briggs memorandum to which Plaintiff refers gave no particulars of

any negotiations occurring between PHLX and any other entity.  Rather, it stated:

> As we discussed in the 15 month plan, the Exchange is still vigorously pursuing
> alliances with firms that will add value to this enterprise and or that see value in
> one of the subsidiaries of Phlx.  In particular, the Exchange is actively seeking
> partnerships with entities that can advance their business model and ours
> simultaneously – the resulting liquidity has a cascading effect where more players
> will seek to interact with the increasing volume captive to Phlx, giving the

---

[17]  "A director, officer, or even the president of a corporation often has superior
knowledge and information, but neither the knowledge nor the information invariably attaches to
these positions."  In re Advanta Corp., No. CIV.A.97-4343, 1998 WL 387595, at *7 (E.D. Pa.
July 9, 1998).

Exchange an expanding footprint.

The recent guidance proposed by the SEC on exchange ownership has delayed [redaction] but also, paradoxically opened new dialogues. Other players within this space have approached Phlx to discuss potential strategic alignments because they read the SEC position similarly and are contemplating investment in exchanges. We are *guardedly optimistic that these new discussions may evolve into more substantive talks, but we are not including any potential revenues associated with these nascent talks.*

(Pl.'s Resp. Mot. Summ. J. Ex. 14 (emphasis added).) The memorandum did not specifically identify which "other players" had approached the PHLX and did not suggest that any firm offer was on the table. Far from informing Board members that there were significant and material developments in obtaining financing for the PHLX, this memorandum simply advised that the possibility was there, but far too speculative to be of any consequence. Indeed, the memorandum, when projecting the PHLX's financial performance for 2004, expressly declined to include potential revenues from any mergers or strategic investors since any talks were "nascent."

Moreover, and as repeatedly noted throughout this opinion, nothing in the Briggs memorandum discloses any information to the Finance Committee that was not already known to the public. As indicated above, in January 2004, after demutualization, Frucher made a public statement that the PHLX was implementing new technology and intended to leverage this and other key assets in order to "ally with strong, innovative third parties." (DSUF Ex. 12.) The Briggs Memorandum did nothing more than re-emphasize this point to the Finance Committee.

d.    Conclusion as to Benton's Knowledge

In short, even were the Court to find that the PHLX had begun material merger negotiations with Arca that required disclosure to a potential investor, Plaintiff has produced absolutely no evidence to create a genuine issue of material fact as to Defendant Benton's knowledge of these negotiations.  All evidence of record suggests that Benton did not learn of the Arca discussions until, at the earliest, December 15, 2004.  Notably absent from Plaintiff's briefing is any evidence – be it documentary, testimonial, or otherwise – indicating that she or, for that matter, any other member of the PHLX Board had the opportunity to learn of the Arca talks prior to that date.  While Benton was undoubtedly aware of the PHLX's efforts to align with strategic investors, such information was equally available to the public and could not be deemed "inside" information.  As such, Plaintiff has failed to meet its burden of putting forth enough evidence to enable a jury to reasonably find in its favor on this issue.  See Anderson, 477 U.S. at 249-50.

**3.    Conclusion as to Section  10(b) Claim**

In light of the foregoing, the Court must grant summary judgment in favor of Defendants on Plaintiff's claim under § 10(b).  Despite having many months to pursue discovery, not only in this case, but in prior and almost identical litigation brought by Plaintiff's counsel, Plaintiff has not produced a shred of evidence that rises above the level of speculative, excessively circumstantial, or blatantly irrelevant.  For the majority of its arguments, Plaintiff either cites no evidence in support or fails to provide much of the evidence that it claims exists.

On the other hand, the evidence of record validly provided by Defendants is unequivocal and uncontradicted – the PHLX had not yet begun any material merger negotiations with Arca as of the date that VDM sold its shares of PHLX stock to Defendant BPII.  Moreover, the evidence clearly reveals that to the extent *any* discussions were occurring, Defendant Benton had no knowledge of such talks and, thus, did not act with any insider knowledge when concluding its trade with VDM.  To allow Plaintiff to rely on denials of those facts "by referring to unidentified evidence provides an unworkable and illogical approach contravening the directive of Rule 56(e) requiring the non-moving party to set forth specific facts showing that there is a genuine issue for trial."  Boykin v. Bloomsburg Univ. of Pa., 893 F. Supp. 409, 412 (M.D. Pa. 1995) (citing Childers v. Joseph, 842 F.2d 689 (3d Cir. 1988)).  Given such proofs, no basis exists for a reasonable jury to award judgment in Plaintiff's favor on this claim.  Accordingly, the Court grants Defendant's Motion for Summary Judgment on this claim.[18]

### B.  Control Person Liability Claim

Section 20(a) of the Securities Exchange Act provides that:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts

---

[18]  Defendants also argue that Plaintiff has failed to prove the other essential elements of a § 10(b) claim, including scienter, reliance/transactional causation, economic loss, and loss causation.  While a cursory review of the evidence provided by the parties on these elements suggests that Defendants' Motion would have merit, the Court declines to discuss or make any definitive ruling on them in light of our dismissal of this claim on other grounds.

constituting the violation or cause of action.

15 U.S.C. § 78t.  Section 20(a) establishes a derivative cause of action in which liability "is premised on an independent violation of the federal securities laws."  <u>In re Rockefeller Cent. Props., Inc. Sec. Litig.</u>, 311 F.3d 198, 211 (3d Cir. 2002).  To succeed on a § 20(a) claim, a plaintiff must show that one person controlled another, and that the "controlled person" is liable under § 10(b).  <u>Avaya</u>, 564 F.3d at 252.  Thus, "once all predicate § 10(b) claims are dismissed, there are no allegations upon which § 20(a) liability can be based."  <u>Shapiro</u>, 964 F.2d at 279.

In the present case, Plaintiff alleges control person liability against Defendant Benton for the alleged § 10(b) violation by her company BPII.  As the Court has granted summary judgment in favor of Defendants on the § 10(b) claim, it necessarily follows that the § 20(a) claim must likewise be dismissed.

An appropriate Order follows.